## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

———————————————

326 LAND COMPANY, LLC, a Michigan
limited liability company,

        Plaintiff,

v

CITY OF TRAVERSE CITY, a Michigan
Home Rule City, SHAWN WINTER, City
Planning Director,

        Defendants.

_____/

Case No. 1:22-cv-45

Honorable Paul L. Maloney

Magistrate Phillip J. Green

Ross A. Leisman (P41923)
James F. Scales (P40639)
Mika Meyers PLC
Attorneys for Plaintiff
900 Monroe Avenue, NW
Grand Rapids, MI 49503
rleisman@mikameyers.com
jscales@mikameyers.com
_____/

Peter B. Worden (P41899)
Garan Lucow Miller, PC
Attorneys for Defendants
3335 W. South Airport Road, Ste. 5A
Traverse City, MI 49684
(231) 941-1611
pworden@garanlucow.com

## PLAINTIFF'S BRIEF:

## IN RESPONSE TO PARTIAL MOTION FOR SUMMARY JUDGMENT
## AS TO COUNTS I, II, IV, V, AND VI, AND CLAIMS OF ESTOPPEL;

## IN SUPPORT OF CROSS MOTION FOR SUMMARY JUDGMENT AS
## TO COUNTS I AND IV.

03304002 1

## TABLE OF CONTENTS

Table of Authorities ................................................................................................ iv

I.     Introduction ................................................................................................... 1

       A.    Background. ........................................................................................ 1

       B.    Summary of Response. ....................................................................... 3

II.    326 Land has Established Vested Rights to Complete its Building ................. 3

       A.    326 Land was proceeding under a building permit issued by Grand
             Traverse County ................................................................................. 3

       B.    326 Land Completed Substantial Physical Construction to Establish
             Vested Rights to Complete the Building as Approved. ......................... 7

             1.    Construction of the Foundation. .............................................. 8

             2.    Fabrication and Delivery of Specialized Materials .................. 12

             3.    Demolition of a Valuable Building May Properly Be Considered
                   Part of the Construction Process. ........................................... 12

             4.    Other Physical Changes. ........................................................ 15

       C.    Vested Rights May be Established Even if Partial Construction Could
             Potentially be Used for a Conforming Building. ................................. 15

             1.    *Gackler* does not apply to facts present here. ........................ 17

             2.    326 Land's situation is more similar to *Eklund v. Clackamas Cty.*,
                   36 Or. App. 73, 82, 583 P.2d 567, 572 (1978), than *Gackler.* ... 19

             3.    The other cases cited by  Defendants – *Heath Twp. v. Sall* and
                   *Belvidere Twp. v. Heinze*- wholly rely on *Gackler* and are factually
                   distinguishable from the facts at issue. ................................... 21

       D.    Conclusion. ...................................................................................... 22

III.   The City Can be Equitably Estopped From Revoking its Land Use Permit ..... 23

       A.    Sale of Condominium Units ............................................................... 26

       B.    Design and Preconstruction Expenses. ............................................. 27

IV.    Count I Alleges a Valid Claim of Procedural Due Process Regardless of Vested
       Rights. .............................................................................................. 28

V.     Counts II, V, and VI do not Depend on the Establishment of Vested Rights................... 30

VI.    Conclusion and Relief Requested. ..................................................................... 31

Index of Exhibits ............................................................................................ 33

03304002 1

# TABLE OF AUTHORITIES

**Cases**

*Association of Data Processing Serv. Orgs., Inc. v. Camp,*
  397 U.S. 150, 153; 90 S. Ct. 827 (1970)........................................................................ 30

*Belvidere Twp v. Heinze,*
  241 Mich App 324, 329; 615 N.W.2d 250 (2000)................................................ 4, 6, 7, 22

*Bevan v. Brandon Township,*
  438 Mich 385, 401; (1991) ........................................................................................ 13

*Bloomfield Twp. v. Beardslee,*
  349 Mich. 296, 307-308; 84 N.W.2d 537 (1957) ........................................................ 2, 14

*Bowers v. Whitman,*
  671 F.3d 905, 916 (9th Cir. 2012) ................................................................................ 16

*City of Detroit v. Walker,*
  445 Mich. 682, 699, 520 N.W.2d 135, 143 (1994).......................................................... 16

*Combs v. Int'l Ins. Co.*
  354 F.3d 568, 577 (6th Cir. 2004) ........................................................................... 13, 17

*Crow v. Bd of Adjustment,*
  227 Iowa 324, 328-29 (1939)....................................................................................... 14

*Cusick v. Feldpausch,*
  259 Mich 349, 352; 243 NW 226 (1932)........................................................................ 16

*De Mall v. City of Lowell,*
  368 Mich 242; 118 N.W.2d 232 (1962).......................................................................... 5

*Devlon Properties Inc. v. City of Boyne City,*
  2008 Mich App. Lexis 2522 (2008)................................................................................ 6

*Dingeman Advertising, Inc. v. Algoma Township,*
  393 Mich 89, 98-99; 223 N.W.2d 689 (1974................................................................ 4, 5, 12

*Dorman v. Township of Clinton,*
  269 Mich App. 638; 714 N.W.2d 350 (2006) leave app den 477 Mich 955; 723
  N.W.2d 905 ......................................................................................................... 6, 17, 21

*Eklund v. Clackamas Cty.,*
  36 Or. App. 73, 82, 583 P.2d 567, 572 (1978).......................................................... 19, 20, 21

*Forman v. Clatsop Cty.*,
    63 Or. App. 617, 619, 665 P.2d 365, 366 (1983)............................................. 19

*Gackler Land Co., Inc. v. Yankee Springs Twp.*,
    427 Mich. 562; 574; 398 N.W.2d 393 (1986)........................................... passim

*Heath Twp. v. Sall,*
    442 Mich. 434, 448, 502 N.W.2d 627, 633-634 (1993) .................................. 6, 8, 21, 22

*Hemlock Semiconductor v. Kyocera Corp.*,
    747 F. App'x 285, 288 (6th Cir. 2018) ....................................... 17

*JGA Development v. Charter Township of Fenton,*
    2008 Mich. App Lexis 1683 (2008).................................................. 6

*Lansing v. Dawley,*
    247 Mich 394; 225 N.W. 500 (1929)........................................... 13, 14

*Mattson v. Chicago,*
    89 Ill. App. 3d 378, 381-82, 411 N.E.2d 1002, 1005 (1980)............................. 13

*Midwest Media Prop., LLC v. Symmes Twp.*,
    503 F.3d 456, 461 (6th Cir. 2007) ................................................ 30

*Minty v. Bd of State Auditors,*
    336 Mich 370, 390; 58 NW2d 106 (1953)........................................... 16

*Nasierowski Brothers Investment Co. v. Sterling Heights,*
    949 F.2d 890 (6th Cir. 1991) .................................................. 29

*Noble Manor v. Pierce Cty.*,
    133 Wash. 2d 269, 283, 943 P.2d 1378, 1386 (1997).................................. 16

*Orozco v. City of Monroe,*
    Case No. 08-13810,2009 U.S. Dist. Lexis 114639 (DC. E.D Mich 2009)..................... 6

*Pittsfield Twp. v. Malcolm,*
    375 Mich. 135, 146; 134 N.W.2d 166 (1965)........................................ 23

*Pure Oil Div v. Columbia,*
    254 SC 28, 33-35 (1970)....................................................... 14

*Rice v. Vill. of Johnstown*,
    30 F.4th 584, 591 (6th Cir. 2022) ............................................. 30

*Sandenburgh v. Michigamme Oil Co.*,
    249 Mich 372; 228 N.W. 707 (1930)........................................... 5, 12

*Save Our Downtown v. City of Traverse City*
___ Mich. App. ___, ___ N.W.2d ___; 2022 Lexis 6164 (Mich. CI App. No.
359536, October 13, 2022) .................................................................................... 1, 3, 28

*Schubiner v. West Bloomfield Township*,
133 Mich App 490, 501; 351 N.W.2d 214 (1984)................................................... 4, 6, 13

*Seguin v. Sterling Heights*,
968 F.2d 584, 590 (6th Cir. 1992) .................................................................. 2, 4

*Twp. of Rose v. Devoted Friends Animal Soc'y*,
No. 356599, 2022 Mich. App. LEXIS 2199 (Ct. App. Apr. 21, 2022) ........................... 23

*Village of Arlington Heights v. Metro. Hous. Dev. Corp.*,
429 U.S. 252, 261; 97 S. Ct. 555 (1977).................................................................. 30, 31

*Warren v. City of Athens*
411 F.3d 697 (6th Cir. 2005) ........................................................................... 29

*Warth v. Seldin*,
422 U.S. 490, 498; 95 S. Ct. 2197 (1975)....................................................................... 30

**Statutes and Court Rules**

MCR 7.215(J)(1)........................................................................................................... 13

## I.   INTRODUCTION.

### A.   Background.

On November 18, 2021, 326 Land was in the midst of active construction of Peninsula Place, a five story, 42-unit residential condominium building located next door to the ten story Park Place hotel in downtown Traverse City.  It had already spent over $102,000 tearing down a useable office building, valued at over $320,000 by the City, to make room for the project.  It had already constructed excavations for pile caps to support a building of a height, shape, and location of the building as approved by the City.  Before doing any of this, it had obtained all required building and land use permits to complete the building.  It had by that time spent just under $1.1 million on design and construction.  It had sold 21 of the condominium units in the building to third party purchasers and had received non-refundable downpayments, totaling over $3.7 million from future residents expecting to live in the building the City had approved.

Late in the day, without warning City staff revoked the Land Use Permit and halted construction.  It did this after a ruling in a lawsuit involving a different building, in which 326 Land was not a party, and in which the Judge specifically ruled that his order did not apply to any ongoing project.[1]

Several years before this, 326 Land planned to construct a 100-foot-tall building on the site.  Section 28 of the City Charter, approved by the voters in 2016, purports to require voter approval of any building with a height above 60 feet.   After the voters refused to approve the

---

[1] Moreover, as described in detail in 326 Land's separate Motion for Summary Judgment on Counts IV and V, the effect of the later Court of Appeals decision reversing the Circuit Court in *Save Our Downtown v. City of Traverse City* ___ Mich. App. ___, ___ N.W.2d ___; 2022 Lexis 6164 (Mich. CI App. No. 359536, October 13, 2022) is that the rooftop appurtenances on 326 Land's building extending above 60 feet in height are not to be included in determining whether a vote is required under Section 28 of the City Charter.  In reaching that decision, the Court of Appeals also relied on reasoning which invalidates Section 28 as preempted by state law.

building, and the Circuit Court ruled that Section 28 of the Charter was valid, 326 Land changed its plans. It designed a building specifically not to require voter approval under Section 28 of the Charter. 326 Land did this based on an Implementation Policy for determining how building height was to be measured for purpose of Section 28. That policy was adopted the Traverse City Commission for the express purpose of being relied on by developers in determining whether their building would require voter approval.

When the City halted construction, work on the 326 Land building had already proceeded to a point where 326 Land had obtained constitutionally protected vested rights to complete the building as approved by the City. These are federally protected interests if established under state law. *Seguin v. Sterling Heights*, 968 F.2d 584, 590 (6th Cir. 1992) According to the Michigan Supreme Court:

> "We cannot state a comprehensive formula. Each case must stand on its own facts. . . . Whether the rights have attained a status so sacred, so inviolate, that they rise above the legislative command, i.e., that the owner has a "vested" right in some particular use, <u>involves a balancing of factors, a determination as to whether the owner's interest is so substantial that its destruction cannot reasonably be justified in the light of the accomplishment of the objectives of the ordinance.</u> It is not a matter susceptible to precise quantitative measurement, so many feet excavated, so many trucks ordered, or so many men hired."

*Bloomfield Twp. v. Beardslee,* 349 Mich. 296, 307-308; 84 N.W.2d 537 (1957) (emphasis supplied)

The protection of vested private property rights in the face of a change in law or government policy is based on fundamental principles of justice and fairness. 326 Land's case is unique in presenting an accumulation of facts in favor of a finding of vested rights which goes beyond those considered in other reported Michigan case law authority.

**B.      Summary of Response.**

Defendant has requested summary judgment on Counts I, II, IV, V, and VI on the sole basis that 326 Land did not obtain vested rights through construction.  This brief responds to that argument, and supports a Cross-Motion for Summary Judgment on Counts I and IV in favor of 326 Land that it had established vested rights.

However, as explained in Sections IV and V below, a procedural due process claim in Count I and the claims in Counts II, V and VI are not dependent on the establishment of vested rights through construction.

Finally, Plaintiff has already separately moved for summary judgment on Counts IV and V on the basis that the published Michigan Court of Appeals decision in *Save Our Downtown v. Traverse City* mandates that 326 Land may complete its building without regard to whether it has established vested rights.

## II.      326 LAND HAS ESTABLISHED VESTED RIGHTS TO COMPLETE ITS BUILDING.

### A.      326 Land was proceeding under a building permit issued by Grand Traverse County.

This may not have been emphasized sufficiently in the Joint Brief in Support of Settlement, but 326 Land had obtained and was proceeding under a building permit issued by Grand Traverse County.  That permit was based upon a Land Use Permit issued by the City confirming that the building complied with the Traverse City Zoning Ordinance ("TCZO") and did not require voter approval under Section 28 of the Charter.

The City of Traverse City administers and enforces the TCZO.  The TCZO regulates the use of property and dimensional characteristics including the height of buildings, which is the central issue in this case.  A Land Use Permit signifies compliance with the TCZO.  Grand Traverse County administers and enforces the State Construction Code within the City for buildings which

03304002 1

have been determined to comply with the TCZO.  The Construction Code focuses on building safety standards such as structural integrity, materials, fire safety, and energy efficiency, and a building permit signifies that the building design complies with the Code.  The Land Use Permit issued by the City was a prerequisite to the issuance of a building permit by Grand Traverse County.  See Weston Deposition, p. 31, **Exhibit A**.

The Michigan Court of Appeals has noted: "Under all of the cases cited herein a building permit, or its counterpart, a permit to commence operations is the *sine qua non* for obtaining "vested rights". *Schubiner v. West Bloomfield Township*, 133 Mich App 490, 501; 351 N.W.2d 214 (1984) (emphasis added).  The importance of obtaining a building or similar permit has been recognized by the federal courts as well.  *Seguin v. Sterling Heights*, supra pp 590-591 (holding a valid building permit is required to show vested rights).  See also, *Orozco v. City of Monroe*, Case No. 08-13810, 2009 U.S Dist. Lexis 114639 (E.D. Mich May 1 (2009).  The significance of obtaining a building permit to establishing a claim of vested rights was emphasized by the Michigan Supreme Court in *Dingeman Advertising, Inc. v. Algoma Township*, 393 Mich 89, 98-99; 223 N.W.2d 689 (1974):

> Once a city or township issues a valid permit to an applicant, that applicant has every reason and right to rely thereon in his business dealings. Permits are not issued by local authorities when the contemplated use for which the permit is issued conflicts with a local zoning ordinance. Should these ordinances change, the average holder of such a permit, even if he had notice of the change of ordinance, would not necessarily presume that the new ordinance applied to him. After all, he has within his possession an official document of the local community authorizing him to proceed with his contemplated project.

The importance of the building permit is that it "specifically approve[s] the construction of a particular structure…" *Belvidere Twp v. Heinze*, 241 Mich App 324, 329; 615 N.W.2d 250 (2000).

The following is the timetable of the issuance of permits by the City and County and the stages of construction:

- June 15, 2021:  326 Land applies to County for demolition permit.  (**Exhibit B**)

- June 22, 2021:  Land use permit issued by City for demolition of building  (**Exhibit C**)

-  June 23, 2021:  Meeting with the architect and representatives of 326 Land, Dave Weston (Traverse City Zoning Administrator), and Shawn Winter (Planning Director):  A focus of the meeting was the rooftop appurtenances.  Applicant was directed to remove storage space and restrooms from top of building.  (**Exhibit D**: Follow up email produced by City; Also, **Exhibit E**,  Winter Deposition pp. 11-12 describing meeting.)

- July 20, 2021: City issues land use permit for structural foundation of five story, 42-unit residential building. (**Exhibit F**)

- July 30, 2021: County issues demolition permit (**Exhibit G**) Note the six-week delay in issuance after application.

- August 2, 2021: Demolition of existing building commences. (**Exhibit H**– Molon Touch Record p. 311)

- August 6, 2021:  326 Land applies to the Grand Traverse County for building permit. (**Exhibit I**)

- August – November 2021.  Waiting over three months for Grand Traverse County to issue building permit.

- November 8, 2021.  Having been informed that a building permit issuance was imminent, construction of pile caps commences.  (Laureto Deposition, pp. 44-45 **Exhibit N**).

- November 12, 2021:  Grand Traverse County issues building permit. (**Exhibit J**)

The fact that 326 Land had obtained a building permit places it into the category of Michigan cases in which vested rights have been found to exist, and distinguishes it from those cases in which vested rights have been found not to exist.  See: *Dingeman Advertising, Inc. v. Algoma Township*, supra; *Sandenburgh v. Michigamme Oil Co.*, 249 Mich 372; 228 N.W. 707 (1930) and *De Mall v. City of Lowell*, 368 Mich 242; 118 N.W.2d 232 (1962) (permit issued for a

junk yard, not a building permit).  The cases in which vested rights were not found to exist based on lack of a building permit include  *Belvidere Twp v. Heinze*, supra.,  *Schubner v. West Bloomfield Township*, 133 Mich App. 490; 351 N.W.2d 214 (1984), *Dorman v. Township of Clinton*, 269 Mich App. 638;  714 N.W.2d 350 (2006) leave app den 477 Mich 955; 723 N.W.2d 905 (concurring opinion denying leave urging adoption of rule <u>not</u> requiring permit); *Devlon Properties Inc. v. City of Boyne City*, 2008 Mich App. Lexis 2522 (2008) (no building permit issued within a 20 month timeframe after the zoning permit was issued) *JGA Development v. Charter Township of Fenton*, 2008 Mich. App Lexis 1683 (2008); *Orozco v. City of Monroe*, Case No. 08-13810,2009 U.S. Dist. Lexis 114639 (DC. E.D Mich 2009) and *Heath Twp. v. Sall,* 442 Mich. 434, 448, 502 N.W.2d 627, 633-634 (1993).

    In the context of this case,  confirmation by the City that the design height would not require a vote under Section 28  made the Land Use Permit of central importance.  For the City to suggest now that the issuance of a Land Use Permit would not qualify the project for vested rights is disheartening.  In the first place, it was the revocation of the Land Use Permit which stopped construction. The City cannot legitimately take the position, on the one hand, that it can stop building construction by revoking the Land Use Permit, but on the other hand take the position that same permit was not really very important at all and cannot provide a basis for the acquisition of vested rights.  See. **Exhibit K**, Letter from Shawn Winter revoking Land Use Permit PLU 21-0112.

    The City goes on to suggest that "if a governmental entity has discretion in its decision making, the landowner lacks a claim of entitlement." City brief p. 18. Reliance by the City on the *Johnson Trust v. Anderson*, and *Tuscola Wind III, LLC v. Ellington Twp*. decisions is seriously flawed.  Those cases involved situations in which the project required a special land use permit,

03304002 1

based on discretionary standards.  In contrast, the 326 Land building was unquestionably a "by right" building, which did not require discretionary special land use approval.  (Winter Deposition, p. 10, **Exhibit E**)("it is a by right use").

The height of the building and the rooftop appurtenances were a specific focus of the Land Use Permit application and review process, as David Weston, Zoning Administrator, described meetings with the 326 principals as follows:

> We scrutinized what was on top of the building.  It seems to me like there was, like, a storage area up there.  It seemed more like an occupiable space.  We questioned it, and they eliminated that from the drawings, I seem to recall.  There were some rooftop amenities, appendages, elevator shafts, vestibule, a commodity elevator per building code, and you know, rooftop area.

Weston Deposition, p. 16, **Exhibit A**

That 326 Land relied on the Land Use Permit is confirmed by its actions.  It did not even commence demolition of the existing building on the site until it had in hand a Land Use Permit for the <u>entire building</u>, and it did not delay in applying for the building permit after it had received the land use permit from the City.  A building permit application was submitted promptly after the City issued the land use permit.  Grand Traverse County took three months to review the plans and issue the permit.

In conclusion, 326 Land has satisfied the prong of the vested rights test by obtaining the necessary building and land use permits for the Peninsula Place building.

**B.     326 Land Completed Substantial Physical Construction to Establish Vested Rights to Complete the Building as Approved.**

In addition to obtaining the necessary permits, the acquisition of vested rights requires actual construction pursuant to those permits.  *Belvidere Twp. v. Heinze*, 241 Mich. App. at 328, summarized the law as follows:

> "To establish a prior nonconforming use, a property owner must engage in work of a substantial character done by way of preparation for an actual use of the premises.

03304002 1

*Gackler Land Co., Inc. v. Yankee Springs Twp.*, 427 Mich. 562; 574; 398 N.W.2d 393 (1986). The work of substantial character must be toward the actual use of the land for the nonconforming purpose. *Id*. at 576. The actual use that is nonconforming must be apparent and manifested by a tangible change in the land, as opposed to intended or contemplated change by the property owner. [*Heath Twp. v. Sall*, 442 Mich. 324, 440; 502 N.W.2d 627 (1993)]. Thus, to constitute a legally cognizable nonconforming use, work of a substantial nature beyond mere preparation must materially and objectively change the land itself." [*Heath Twp*, 442 Mich. at 441].

### 1.    Construction of the Foundation.

The best evidence that work of an apparent and substantial character was underway when the stop work order was issued is the photograph taken on November 18, 2021, the day prior to issuance of the stop work order. (**Exhibit L**; also reproduced with better quality).[2]   Hardman Construction is one of a few contractors that installs foundations using the pile cap/piling technique.   As can be seen from the photograph, the crane which Hardman uses was on site and being assembled.   This confirms that the pile cap excavations had been constructed when the stop work order was issued.

The photograph also shows that by that time, the site had been lowered in preparation for the building approved by the City.   A significant amount of dirt had been removed from the site. (McIntyre Deposition, p. 18, **Exhibit M**).   Lowering the site was necessary to construct a building to the maximum height allowed without triggering a vote under Section 28.   Removing soil is expensive, and builders prefer to balance the soil on site if possible.   A different building could have been constructed without that amount of soil removal.

---

[2] The construction manager, Jon Laureto of REI Construction was able to accurately date on this photograph, based on the state of assembly of the equipment on the site when he received a phone call from Traverse City's Planning Director, Shawn Winter, informing him that the stop work order was going to be issued. (Laureto Deposition, pp. 24-25, **Exhibit N**).   Mr. Laureto testified that the timing of construction required that the pile cap excavations had to be in place for the installation of the pilings and pile caps by Hardman.   (Laureto Deposition pp. 45-46, **Exhibit N**).

03304002 1

Because of soil conditions, a traditional foundation system would not support the height and weight of this building. (Laureto Deposition pp. 42 – 43, **Exhibit N**). Therefore, the building foundation was designed to consist of pilings installed in groups, on top of which is a "pile cap". The steel for the building rests on the pile caps. (McIntyre Deposition, pp. 23-24, **Exhibit M**). Mr. Laureto and Mr. McIntyre testified that the location, size and depth of the pile cap excavations reflect the size, shape, and weight of this particular five story building and the soil conditions on this site. Obviously, the weight of the building depends directly on its height.

The pile caps were installed to the specifications prepared by the structural engineer for the project. (Laureto Deposition pp. 42-43, **Exhibit N**). These plans show the size and location required for the pile caps and include pages of specifications for the pile cap top and bottom elevations. (Pile Cap Plans and Specifications, **Exhibit O**). These constructed pile cap excavations correlate to the structural foundation plans prepared by the structural engineer and provided to Hardman. 326 Lands's managing member, Tom McIntyre, testified that pile cap excavations have close tolerances, and the elevations are surveyed within a half of an inch to ensure that the building will be square and structurally sound. (McIntyre Deposition, pp. 23-24, **Exhibit M**).

The photograph shows that the pile cap excavations around the perimeter of the site had been constructed before the Land Use Permit was revoked. (McIntyre Deposition, p. 22 **Exhibit M**). As can be seen from the photographs, the pile cap excavations are constructed of a particular shape and at locations around the perimeter of the site. Construction of the pile cap excavations was a distinct separate process from lowering and leveling the site. (McIntyre Deposition, p. 18, **Exhibit M**). These are apparent signs of physical construction of this particular building.

On page 20 of its brief, the City attempts to cast doubt on the state of construction by stating that city staff passing by the site did not observe the crane being erected on the site. As noted in

Mr. Laureto's testimony, the pile cap excavations had already been constructed when the crane was being erected.  Those excavations were not constructed by the crane.  Moreover, as the aerial photograph demonstrates, observing construction from ground level would be problematic.  In addition, the City misstates Mr. McIntyre's testimony that "only 6 pile cap excavations" out of 318 had been constructed.  To the contrary, Mr. McIntyre was referring to the 300 pilings, not the pile caps.  As shown by the foundation plans (Pile Cap Plans and Specifications, **Exhibit O**) there were approximately 28 sites for pile cap excavations and the photograph demonstrates that those located around the perimeter of the site had been constructed when the stop work order was issued.  Because of constraints on the size of the site, the construction of these locations had to be completed, then the machinery moved to construct the remining pile caps in the middle of the site.  (Laureto Deposition, p. 31, **Exhibit N**).

The City also relies on heavily on its assertion that the foundations installed could have supported a shorter building.  Deposition testimony established that the foundation was specifically designed for a building of this height and weight.  (McIntyre Deposition, p. 31, **Exhibit M**).  Under questioning by the City's attorney, Mr. Laureto testified that while it might be possible that the pile caps could support a shorter building, they would "oversized" or "over engineered" for a shorter building.  (Laureto Deposition p. 60, **Exhibit N**).  One could speculate that the foundations could very solidly support a single-story gift shop, or the reconstruction of the law office which had been there in the first place.  The important point, however, is that these foundations were designed and constructed to support this five story building, not a shorter building.

As further proof of the actual progress of construction, Mr. Laureto referred to the "touch records" of Molon Excavating, which list the names of Molon's personnel and hours worked each day.  After demolition, work had recommenced a few days before the building permit was issued

03304002 1

on November 12, 2021, when the construction manager was made aware that the permit issuance was forthcoming shortly.  (Laureto Deposition pp. 44-47, **Exhibit N**)   Those records show that from November 8 through November 18, over 133 hours were devoted by Molon to its work, including construction of the pile cap excavations.  These records do not show merely an "intended or contemplated" change in the land.  These are records which were kept in real time by actual construction workers, operating real construction machinery, and constructing a foundation specifically designed for a building of this height and weight.  (Molon Touch Records **Exhibit H**).

In addition, as of July 22, 2021, REI Construction began invoicing for actual construction cost incurred for the project.  (Laureto Deposition, pp. 50 – 51, **Exhibit N**; REI Payment Requests attached as **Exhibit P**).  The payment requests demonstrate substantial construction work.  The December 1, 2021 sworn statement in support of Payment Request No. 4, which includes actual work done in November before the stop work order, is for $106,982.  None of this is for demolition, which was reflected on a previous pay request.  The January 2022 request, which due to billing lag includes some pre-stop work order work is $171,291, not including Hardman's work.

The completed work as demonstrated by the photograph, documents and deposition testimony goes well beyond the description of the work in progress in those Michigan decisions which found that vested rights had not been obtained.  The photograph shows a material, objective, and apparent manifestation by physical change in the land.  That the construction is substantial in nature is confirmed by the "touch records" and the payment applications.    The testimony and construction plans demonstrate that this work was necessary to support a building of this height and weight and that a shorter and therefore lighter building would not require the foundation that was under construction for this project.

03304002 1

### 2.      Fabrication and Delivery of Specialized Materials.

After the pile cap excavations are constructed by Molon, Hardman installs the pilings and pile caps.  Reinforcing steel ("rebar") is installed in each of the pilings.  The rebar was ordered and manufactured to the specifications for this project.  Mr. Laureto described the rebar as follows: "A rather large bar and they have to be a certain depth and it there has to be a bend in them at the right spot at the top."  330 of these were required for this project.  (Laureto Deposition, pp. 48-49, **Exhibit N**).  That rebar was fabricated and on site when the stop work order was issued (Laureto Deposition, p. 29, **Exhibit N**).  REI's pay request for October 20, 2021 (**Exhibit P**) includes a non-refundable $138,750 deposit paid to Hardman.  A portion of this was for the cost of purchasing the fabricated rebar.

The fabrication and delivery of specialized materials were found to be factors in favor of obtaining vested rights both in the *Dingeman Advertising* and *Sandenburgh* decisions noted above. The City's response to this, again, is that the rebar could have been used to construct a shorter building.  This response assumes without basis, however, that the same rebar would have been specified for a shorter building.  In fact, the project was bid based on the weight of this building which determined the number of pilings and thus the amount of rebar, its length, gauge of the steel, and location of the "hook"  to connect into the pile cap .  The rebar was made for a building of this particular height and weight. (Hardman Email Confirming Length and Gauge of Rebar, **Exhibit Q**).

### 3.      Demolition of a Valuable Building May Properly Be Considered Part of the Construction Process.

In this situation, the demolition of the existing law office building may properly be considered as part of the actual construction process in establishing vested rights.  The genesis of the "rule" that the removal of "old buildings" was not sufficient to obtain vested rights is *Lansing*

*v. Dawley,* 247 Mich 394; 225 N.W. 500 (1929), in which the court specifically noted that the owner had testified that the demolished building had <u>no value</u>. *Id.,* p. 396.  The typical recitation of the rule is that "preliminary operations, <u>such as</u> ordering of plans, surveying the land, and removal of old buildings" is not sufficient to establish vested rights.  *Bevan v. Brandon Township*, 438 Mich 385, 401; (1991).  In other words, if the removal of an "old" building is akin to merely ordering plans, it is not to be considered as a factor in obtaining vested rights. Only one other case actually involved the removal of a building, and the decision includes no discussion of the value of the building.  *Schubiner v. West Bloomfield Twp., supra.*[3]  This "rule" is repeated by rote in several decisions, but none of those cases apparently involve the demolition of a building.  There is no Michigan case law which holds that demolition of a valuable, usable building cannot be considered as part the process of substantial construction.  A Federal Court sitting in diversity or supplemental jurisdiction must make the best prediction, even in the absence of direct state precedent, of what the State Supreme Court would do if it was confronted with the question. *Combs v. Int'l Ins. Co.* 354 F.3d 568, 577 (6th Cir. 2004).

The Courts of other jurisdictions have found that the removal or demolition of valuable existing structures can be a factor in establishing vested rights. In *Mattson v. Chicago*, 89 Ill. App. 3d 378, 381-82, 411 N.E.2d 1002, 1005 (1980), the plaintiff tore down a single-family home worth $40,000 at a demolition cost of $1,600 to construct a 6-unit apartment building. The court found a vested property right to build the apartment building because this was an action taken in good faith based on the "probability of issuance" of a building permit.  Demolition of a home was also noted as one factor establishing a vested right to erect a building housing a veterinary hospital and

---

[3] Under the Michigan Court Rules, that pre-1990 Court of Appeals decision is not binding precedent.  MCR 7.215(J)(1).

apartment, because it was a substantial expense and the property owner had obtained a permit. *Crow v. Bd of Adjustment*, 227 Iowa 324, 328-29 (1939).  A property owner which tore down a salon and dry cleaner to construct a gas station established a vested right to build the gas station because it was entitled to the issuance of a permit although it had not yet obtained one. *Pure Oil Div v. Columbia*, 254 SC 28, 33-35 (1970).

Michigan law emphasizes that each case must stand on its own facts in determining if the owner's interest is so substantial that its destruction cannot be justified.  See, e.g. *Bloomfield Twp. v. Beardslee, supra at 307 – 308*.  Under the facts of this case the demolition of the law office is properly and fairly considered in determining if 326 Land has acquired vested rights.

Because the Peninsula Place building would occupy essentially the entire site, removal of the law office building was an essential part of construction.  (Laureto Deposition, p. 53, **Exhibit N**).  Prior to the law office building being demolished in August 2021, the building and land improvements were valued at approximately $320,000, not including land value, by City assessment records (2020 Assessment Record, **Exhibit R**; a state equalized value of $160,100 represents 50% of estimated true cash value).  The building was occupied and used as a law office until preparations were made for its demolition.  In contrast to the property owner in *Dawley*'s characterization, Tom McIntyre testified that this site was a "perfectly good office building." (McIntyre Deposition, p. 18, **Exhibit M**).  In July and August 2021, 326 Land spent $105,476 for asbestos abatement and demolition of this "perfectly good" building.  (REI Payment Requests, **Exhibit P**, Pay Request No. 1; "Site construction" and "hazardous materials" line items).

The timing confirms that the demolition of the building may properly be considered as the commencement of substantial construction.  326 Land had in hand the City Land Use Permit for the contemplated five-story, 42-unit Peninsula Place building <u>before</u> it began demolition (City

03304002 1

Permit for Construction, **Exhibit F**).  326 Land had also at that time obtained permits and approval for groundwater runoff, soil erosion control, utilities, right-of-way use, and approval from the Fire Department.  (Other City Permits, **Exhibit S**).  326 Land applied to the County for a building permit on August 6, 2021, while the demolition was underway.  (County Building Permit Application, **Exhibit I**).  The delay in continuing construction was a result of the inordinate amount of time taken by the County to issue the building permit.  However, as noted above, when notified that the building permit was to be issued, construction resumed immediately.

Therefore, under these circumstances, the demolition of the building may properly be considered as an objective, manifest, and substantial beginning to the process of constructing this building.

### 4.      Other Physical Changes.

Deposition testimony also established that 326 Land had made other physical changes to the land, including removal and storage of pavers from the adjacent sidewalk and shoring up of a walkway on the adjacent Parkway property.  The property was surrounded with protective fencing to protect the construction site.  In 2017, when the adjacent Lofts apartment building was being constructed, the adjoining landowners agreed to installation of a strengthened foundation in contemplation of future construction on the 326 Land site.  (McIntyre Deposition, pp. 18-19, 26, 37, **Exhibit M**; Laureto Deposition pp. 34-35, **Exhibit N**)  Utilities had been disconnected and capped, and the streets patched. (Laureto Deposition, pp. 35-36 **Exhibit N**)

### C.      Vested Rights May be Established Even if Partial Construction Could Potentially be Used for a Conforming Building.

Michigan Courts have repeatedly held that a   court must consider the totality of circumstances when determining whether a nonconforming use/structure has reached a vesting point. Yet the City, citing a trio of cases, argues that "where the construction activities improve a

property in a manner consistent with both conforming and nonconforming uses, the construction

does not create vested rights in the nonconforming use." Such a bright line rule to establish a

vesting point is directly contrary to the totality of the circumstances approach adopted in Michigan.

If Defendant's characterization of the rule was the law, the doctrine of vested rights would be

nonexistent—there is always a separate conforming use available. Rather, the point of a "vested

right" is to protect property rights against the peril of uncertainty, regardless if another conforming

use is available. "[T]he purpose of the vesting doctrine is to protect the expectations of the

developer against fluctuating land use laws." *Noble Manor v. Pierce Cty.*, 133 Wash. 2d 269, 283,

943 P.2d 1378, 1386 (1997). The vested rights doctrine is "based on principles of detrimental

reliance." *Bowers v. Whitman*, 671 F.3d 905, 916 (9th Cir. 2012).

Such an inflexible rule as suggested by Defendants has been warned against in several

Michigan Supreme Court opinions:

> A vested right has been defined as an interest that the government is compelled to
> recognize and protect of which the holder could not be deprived without injustice.
> *Cusick v. Feldpausch,* 259 Mich 349, 352; 243 NW 226 (1932), citing 2 Cooley,
> Constitutional Limitations (8th ed), p 749. Nonetheless, when determining whether
> a right is vested, policy considerations, rather than inflexible definitions must
> control, and we must consider whether the holder possesses what amounts to be a
> title interest in the right asserted. We explained in *Minty v. Bd of State Auditors,*
> 336 Mich 370, 390; 58 NW2d 106 (1953): "It would seem that a right cannot be
> considered a vested right, unless it is something more than such a mere expectation
> as may be based upon an anticipated continuance of the present general laws; it
> must have become a title, legal or equitable, to the present or future enjoyment of
> property, or to the present or future enforcement of a demand, or a legal exemption
> from a demand made by another."

*City of Detroit v. Walker*, 445 Mich. 682, 699, 520 N.W.2d 135, 143 (1994).

> Michigan's current rule implicates both due process guarantees and the stability
> and predictability of property rights. A rule that leaves a property owner's ability
> to build uncertain or tentative until late in an extended building process may act as
> a deterrent to the exercise of property rights, because an owner could be forced to
> expend considerable sums of money absent any assurance that the local zoning
> authority will not alter existing zoning at the last minute. Moreover, such a rule

raises questions concerning at what point a change in zoning can fairly be construed as being effectively retroactive in character.

The building permit process has changed dramatically since the majority rule on vesting was originally adopted in Michigan. As a result, the current rule raises both practical and due process concerns. Balanced with this are considerations that pertain to the ability of local jurisdictions to exercise their zoning authority in a flexible and plenary manner. In an appropriate case, I believe that this Court should more fully consider the merits of alternative rules of vesting and determine whether our current rule should be maintained.

*Dorman v. Twp. of Clinton*, 477 Mich. 955, 957, 723 N.W.2d 905, 907 (2006) (Markman, J., concurring).   Such guidance is most persuasive when a Federal Court must predict how the Michigan Supreme Court would decide an issue in the absence of controlling authority.   See *Hemlock Semiconductor v. Kyocera Corp.*, 747 F. App'x 285, 288 (6th Cir. 2018).   ("With no Michigan authority on point,, we must look elsewhere to attempt to discern what path the Michigan Supreme Court might take."), citing *Combs v. Int'l Ins. Co.*, 354 F.3d 568, 577 (6th Cir. 2004).

Defendant's purported "conforming use requirement" originates from *Gackler Land Co. v. Yankee Springs Twp.*, 427 Mich. 562, 398 N.W.2d 393, 398-99 (1986).

### 1.   *Gackler* **does not apply to facts present here.**

In *Gackler*, at issue was whether the plaintiff-developer had established a vested nonconforming use as a "single-wide mobile home plat." The plaintiff had already built mobile homes on a portion of the plat. However, the focus of the nonconforming use inquiry was the remainder of the plat that had yet to be built on.[4]   The Township approved the plat at issue for both mobile homes and dwellings. Conventional homes already had been constructed on the platted lots. See *Gackler Land Co. v. Yankee Springs Twp.*, 138 Mich. App. 1, 10, 359 N.W.2d 226, 230

---

[4] *Gackler* noted it was irrelevant that one-fourth of the back lots were occupied by mobile homes. The focus of the nonconforming use was on the vacant portion of the plat. Agreeing with the trial court, the court noted that the vacant lots would sell for conventional or mobile homes if the price was realistic. The court added that the investment in the lots was small.

(1984). Put otherwise, it appeared that when going through the platting process, the plaintiff-developer knew or had planned that the plat would be used for either mobile homes or conventional lots.[5] As such, the *Gackler* Court recognized that the developer was merely trying to preserve the option for a particular use, not the right to a particular use. "Accordingly, what plaintiff actually and understandably seeks here is a preservation of an option to sell the unsold lots as sites for *future* nonconforming uses." *Gackler Land Co. v. Yankee Springs Twp*., 427 Mich. 562, 577-78, 398 N.W.2d 393, 400 (1986).

After the plat was approved, both 1) covenants were recorded on certain lots to prevent the building of mobile homes and 2) the Township enacted a zoning ordinance restricting certain mobile homes as a use. At that point, plaintiff had constructed a road, the plat was surveyed, grading and excavation was completed, and 11 mobile homes were installed. The *Gackler* Court, in responding to the dissent, stated that these improvements were equally suitable for mobile homes and conventional dwellings. However, the Court conceded that this fact was merely one factor in the analysis.

> "[A] property owner who claims a vested right to a nonconforming use <u>need not show that the land cannot feasibly be used in conformity with the changed zoning</u>" While this statement may be true in general, whether the land is suitable for the uses permitted in the zoning ordinance <u>is relevant</u> to the question whether a nonconforming use exists at the time the zoning ordinance is enacted.

*Gackler Land Co. v. Yankee Springs Twp*., 427 Mich. 562, 576, 398 N.W.2d 393, 399 (1986). (internal citations omitted) (emphasis added). Ultimately, the Court determined that the plaintiff

---

[5] In comparing its facts to other mobile home vested rights cases, *Gackler* noted that "[b]ecause an insubstantial number of lots in the plat are occupied by mobile homes, <u>and the lots are </u>suitable for more than single-wide mobile housing, this case is distinguishable from the  trailer park cases <u>where use of the vacant spaces for trailers was readily apparent</u>. *Gackler Land Co. v. Yankee Springs Twp*., 427 Mich. 562, 576-77, 398 N.W.2d 393, 399 (1986)

had not established a tangible change by way of preparation for the actual use of the property as a single-wide mobile home plat. *Id*. at 566.

Gackler and its reasoning are inapposite to the instant case. As explained above, whether the property can be used in conformity with the changed zoning is only a factor in determining whether a nonconforming use exists. The particular details of *Gackler* in assessing the relevancy of this factor are important, as limitlessly expounding on this factor destroys the purpose of vested rights - property can always be put to some conforming use. In *Gackler*, a plat was approved for both mobile home and conventional homes. While plans were in place to build some mobile homes, the Township at issue did not specifically approve a mobile home-only plat.

Here, however, Plaintiff made significant investment based on approval of both the City and Grand Traverse County for the construction of this specific building. This investment and reliance is described in detail in other sections of this brief.

*Gackler* also emphasized that the plaintiff-developer in its case was attempting to preserve the option to sell the unsold lots as sites for <u>future</u> nonconforming uses. This is a critical difference: 326 Land has already sold 17 units in this five story building to third party purchasers who have paid $3.7 million in nonrefundable deposits.  The size of the building cannot be reduced, while still honoring the contract and investments by these people.

> **2.     326 Land's situation is more similar to *Eklund v. Clackamas Cty.*, 36 Or. App. 73, 82, 583 P.2d 567, 572 (1978), than *Gackler*.**

In making its determination, *Gackler* compared its facts with that of *Eklund v. Clackamas Cty.*, 36 Or. App. 73, 82, 583 P.2d 567, 572 (1978) overruled on other grounds by *Forman v. Clatsop Cty.*, 63 Or. App. 617, 619, 665 P.2d 365, 366 (1983).  The *Gackler* Court noted that if its facts were more similar to *Eklund*, a different resolution would be appropriate. See *Gackler Land Co. v. Yankee Springs Twp.*, 427 Mich. 562, 575, 398 N.W.2d 393, 399 (1986).

In *Eklund*, a developer attempting to build a subdivision had already constructed a water system after being issued approvals by the State of Oregon. However, a boundary commission, created by statute mid-project,[6] denied the extension of the water system because it was "in violation of the County Comprehensive Plan, the LCDC goals and the CRAG Regional Land Use Plan." At this time, the developer only had conditional approval to build their subdivision plat and had only constructed 20 of 108 houses. The developer had, however, almost completed the water system capable of supplying water to 108 homes relying on governmental approvals. In determining that the developer had a vested right, the *Eklund* Court greatly relied on the fact that the developer had substantially invested in the project and were operating at a loss. The costs of the project (and water system) were to be borne by 108 owners, not 20. *Eklund v. Clackamas Cty.*, 36 Or. App. 73, 80, 583 P.2d 567, 571 (1978). The developer expended what the court described as "substantial monies." Specifically, the developer expended "$15,000 in clearing the land, $57,764 in constructing the water system and $83,000 for attorney fees and surveying and design costs." *Eklund v. Clackamas Cty.*, 36 Or. App. 73, 81, 583 P.2d 567, 571 (1978).

The *Gackler* Court referred to the facts of *Eklund* as a "clear injustice." *Gackler Land Co. v. Yankee Springs Twp.*, 427 Mich. 562, 575, 398 N.W.2d 393, 399 (1986). Further, the *Gackler* Court did not emphasize that the *Eklund* developer could have used the water system for a conforming use (i.e. to serve less homes). Similar to *Eklund*, Plaintiff had begun the final phase of its project—construction of its building—when it was issued a stop work order. Similar to *Eklund's* almost complete water main, 326 Land demolished a valuable building, specifically constructed pile caps, paid for and took delivery of rebar specified for the weight of the building in reliance of

---

[6] Note that the developer delayed the project for purposes of economy. If it had prudently pursued the project, it likely would have completed the project before this requirement was added. However, the Court did not punish them for such a decision.

valid Land Use and building permits issued by the City and County.  326 Land has already

expended substantial monies.  It paid $460,882 in architectural fees, $104,360 in engineering fees,

and over $479,296 in actual construction costs.  (See Peninsula Place Construction Disbursements,

**Exhibit T**; REI Payment Requests, No. 4, **Exhibit P**).  It had also entered into binding contracts

to sell 21 of the condominium units, accepting over $3.7 million in non-refundable deposits from

purchasers of those units.   (Peninsula Place Deposits **Exhibit U)**. Through its substantial

investment and commencement of construction, 326 Land's presents a  "clear injustice" like that

described in *Eklund*. The sentiments in *Eklund* also directly comport with Michigan law. As stated

by the Michigan Supreme Court well after *Gackler*: "In Michigan, in order to have a vested interest

in the rezoning of the property, plaintiff would need to have secured a building permit for the

construction necessary to take advantage of the existing zoning classification *and* expended a

substantial investment in performing that construction." *Dorman v. Twp. of Clinton*, 477 Mich.

955, 956, 723 N.W.2d 905, 905 (2006).

> **3.**     **The other cases cited by  Defendants – *Heath Twp. v. Sall* and *Belvidere Twp. v. Heinze*- wholly rely on *Gackler* and are factually distinguishable from the facts at issue.**

Both of the above cited cases follow *Gackler* and, without further citation, rely on its "other

conforming use" factor. In *Heath*, the developers spent approximately $18,000 preparing to

develop a mobile home park. This money was spent (1) obtaining a topographical survey, (2)

clearing trees and removing topsoil, (3) installing four test wells, (4) excavating roads, (5) drilling

a commercial water well, and (6) building a wellhouse. After this work, a referendum changed the

zoning classification of the property, and the township issued a stop work order. The *Heath* Court,

in following *Gackler*, found that more construction work had been performed in the latter case,

and thus, substantial construction could not have taken place. Despite coming to this conclusion,

*Heath* recognized that there is no specific formula a court must follow. "We cannot state a

03304002 1

comprehensive formula for precisely what activities are sufficiently substantial to eclipse the prior nonconforming use threshold. It is not a question susceptible of precise quantitative measurements. An evaluation of whether construction is substantial is 'necessarily subjective and varies from case to case.'" *Heath Twp. v. Sall*, 442 Mich. 434, 447, 502 N.W.2d 627, 633 (1993).

This case is not comparable to *Gackler* or *Heath*. There is no grand subdivision, plat, or mobile home development being constructed, this is a single building. Further, a building permit was not acquired in *Heath*. The *Heath* Court recognized this and found it to be determinative. "Their construction was not of a 'substantial character,' nor did they obtain a mobile home permit." *Heath Twp. v. Sall,* 442 Mich. 434, 448, 502 N.W.2d 627, 633-34 (1993).

In *Belvidere*, the court concluded that "the improvements [construction of a manure pit and sewer system]  are equally useful for a lawful, conforming use, such as the operation of a hog farm that does not qualify as a concentrated livestock operation." *Belvidere Twp. v. Heinze*, 241 Mich. App. 324, 329-30, 615 N.W.2d 250, 253 (2000). Again, unlike this case, the plaintiff in *Belvidere* never sought a building permit. The *Belvidere* Court even emphasized this point. "[A] building permit along with construction work may give rise to a vested right to construct the approved structure." *Belvidere Twp.*, 241 Mich. App. at 329. Otherwise put, had the plaintiff in *Belvidere* obtained a building permit, the case likely would have had a different result.

### D.      Conclusion.

This case stands out from other Michigan decisions which have found that no vested rights were obtained, by virtue of the accumulation of facts in favor of a finding of vested rights.  326 Land had obtained a Land Use Permit from the City for the entire completed building, before it undertook any construction activities.  It had obtained a building permit for the completed building. It demolished a valuable office building.  It had lowered the site to accommodate the proposed building.  It had begun constructing the foundation of the building.  Specialized materials designed

for the specific height and weight of this building had been delivered.  Based on deposition testimony and the exhibits, 326 Land requests that this Court find that there is no disputed issue of fact, and that it had established vested rights to complete the building as approved by the City.

At a minimum, the deposition testimony and exhibits referred to in this brief constitute well more than a "scintilla" of evidence that vested rights have been established.  In particular, the City relies heavily on the assumption that a shorter building could satisfy the legitimate investment backed rights of 326 Land.  As shown, the construction that was completed was for the weight of a five story building, and 326 Land in good faith had already sold and taken non-refundable deposits for this particular building, not a shorter building.

## III.   THE CITY CAN BE EQUITABLY ESTOPPED FROM REVOKING ITS LAND USE PERMIT.

In Count I, allegation 108 of Plaintiff's complaint, 326 Land alleged: "The City is estopped from issuing the stop work order for construction as approved by the July LUP."

Michigan courts recognize that a municipality may be estopped from changing its position in exceptional circumstances, such as are present here.  The doctrine of equitable estoppel against a municipality in a land use dispute was most recently acknowledged by the Michigan Court of Appeals in April 2022 in *Twp. of Rose v. Devoted Friends Animal Soc'y*, No. 356599, 2022 Mich. App. LEXIS 2199 (Ct. App. Apr. 21, 2022) (**Exhibit V**).  Relying on existing published Michigan authority, the Court of Appeals noted that a municipality:

> "Can be equitably estopped from enforcing a zoning ordinance when (1) a party by representation, admissions or silence, intentionally or negligently induces another party to believe facts; (2) the other party justifiably relies and acts on this belief; and (3) the other party will be prejudiced if the first party is permitted to deny the existence of the facts."

*Id.,* quoting *Pittsfield Twp. v. Malcolm*, 375 Mich. 135, 146; 134 N.W.2d 166 (1965).

The Court of Appeals went on to hold:  "The prejudice must be more than *de minimis,*" and must be based on "exceptional circumstances."  The "presence of 'exceptional circumstances' does not turn on any one factor, but whether "the entire circumstances, viewed together, present compelling reasons why equity should refuse the municipalities' enforcement of its ordinance." *Id*.

Although estoppel typically is raised as a defense to a lawsuit, there is no Michigan authority which holds that the doctrine of equitable estoppel may be asserted only in that context and not as a defense to an administrative action such as a stop work order.  In this situation, the doctrine is being asserted as a defense to the revocation of the Land Use Permit by the City, initiated by official action issued by the City Planning Department revoking Land Use Permit PLU 21-0112.

This was not simply a polite request.  Under the TCZO, it is illegal to continue construction once the Land Use Permit has been revoked.  TCZO Section 322.01(i).  To continue construction following revocation of the Land Use Permit would be a violation of law, subject to fines and penalties, and each day that violation continued would constitute a separate offense.  TZCO Sections 1322.06 and 1322.99.

The City appears to acknowledge that had 326 Land chosen to violate the law by continuing construction, then it could have raised the equitable estoppel defense in a civil infraction or injunction proceeding brought by the City.  It defies logic that relief based on equitable estoppel will be available only if 326 Land deliberately violated the law and forced the City to file an ordinance infraction or injunction proceeding to enforce its ordinance.

The elements of equitable estoppel to the revocation of the Land Use Permit are present here:  First, the Implementation Policy was adopted by official action of the City Commission.

(Implementation Policy, **Exhibit W**)  It is undisputed that the City Staff and 326 Land relied on that Implementation Policy in issuing the Land Use Permit for the building, which thus allowed issuance of a building permit by the County.  This was an official, deliberate policy, not offhand or casual advice.  The policy stated specifically that its purpose is to "be relied on by property owners… to ensure consistency and predictability" in applying Section 28.  Moreover, it has been acknowledged by the City that "subsequent to the adoption of the Implementation Policy, and prior to 326 Land's project, three other building projects were commenced within Traverse City which each measured 60 feet in height, not including rooftop equipment and appurtenances without a vote under Section 28." City Brief, p. 3.

It cannot be legitimately questioned that 326's reliance on the Implementation Policy and Land Use Permit was justifiable.[7]

Applying the doctrine of equitable estoppel allows consideration of not only the actual physical construction which had taken place, but other circumstances presenting reasons why the City should not be able to change its position.  In addition to the expenditures for construction and demolition activities described above and destruction of a valuable building, there are other factors which constitute exceptional circumstances justifying estoppel of the City.

---

[7] The City makes a backhanded attempt to place blame on 326 Land for not halting its project indefinitely based on an article in the Traverse City Tickler about the Innovo lawsuit, published the day after the Land Use Permit was issued.  Presumably, the City knew about the case before the article was published.  If the Innovo case had such importance, why did the City issue or  not revoke the Land Use Permit at that time?

A.      **Sale of Condominium Units.**

Other than actual construction, the most notable "exceptional circumstance" is that 326 Land had already entered into binding sales contracts for 21 of the 42 units in this building.[8]  This project was conceived and marketed as a "self-financing" project, and before the stop work order was issued, 326 Land had already accepted over $3.7 million in non-refundable deposits from purchasers, which were being used for construction costs.  (Peninsula Place Deposits, **Exhibit U**).

It is critical to understand that removing the rooftop appendages above 60 feet is not a simple matter of lopping off a few structures or lowering the roof.  It changes the entire design of the building and is devastating to this project.  As Tom McIntyre explained at length in his deposition, one of the most attractive features of the building is its rooftop deck with a view of Grand Traverse Bay.  Access to a rooftop deck requires stairwell access to the roof, which must extend above the roof.  Mr. McIntyre commented:

> "So, what that means is if we have to remove the rooftop deck, which is part of the original plan, it is a very, very serious problem for us, because that would give all these buyers the opportunity to back out.  We in effect are defaulting on our contract if we don't build it as designed . . . .  [The buyers have] seen the pictures, this marketing brochure, and we have represented that we are going to put a rooftop deck on the building, and that is probably the most significant representation that we make."

McIntyre Deposition, pp. 66-67, **Exhibit M**.

Preserving the rooftop deck would likely require eliminating one floor – the most attractive top floor – "that is a minimum of $10 million in sales that we would lose, probably $11 million." The top floors of the building are the most attractive and valuable:

> "So, as you lower the height of the building you limit the view of the bay, and one of the big attractions to this building is the fact that we had this rooftop terrace, and the owners would be able to go up to that rooftop terrace and have a beautiful view.

---

[8] Seventeen of the sales are to unconnected third parties; principals in 326 Land purchased four units.

Not just a good view, but a beautiful, spectacular view of the bay and that is a very appealing part of this.  So, if we have to eliminate that view, it diminishes the value of all the units in the entire building.  People are paying a premium because of that view, and so there are significant dollars . . . you know, upwards of $20 million worth of value, that could easily go away in this project."

McIntyre Deposition, pp. 71, **Exhibit M.**

Reducing ceiling height is an unacceptable alternative.  The designed ten foot ceilings were necessary for sale of luxury units.  Reducing ceiling heights to eight feet eight inches is consistent with lower quality rental apartment units, not luxury condominium units with a view of Grand Traverse Bay.  (McIntyre Deposition, p. 73, **Exhibit M**).

The purchase and sale of these 21 condominium units is an "exceptional circumstance" estopping the City from revoking its land use permits, viewed both from the perspective of 326 Land, and from the perspective of the individuals which have purchased and made a significant non-refundable deposit on these units.  These people purchased a specific unit, with a specific floor plan in the Peninsula Place building – even down to the level of selecting bathroom fixtures.  They would be denied their contractual right to occupy these units if the City is permitted to change its position.

B.    **Design and Preconstruction Expenses.**

In addition, in considering "exceptional circumstances" for purposes of the doctrine of equitable estoppel, the significant amount spent on preconstruction activities may be considered.  326 Land spent $460,882 on architectural plans, and $104,360 on engineering and structural design services.  In addition, it paid REI Construction over $68,000 for planning and preconstruction activities, not reflected on pay requests.  (Peninsula Place Construction Disbursements, **Exhibit U**; McIntyre Deposition, p. 43, **Exhibit M**).

27

All of these expenditures were made in reliance of the implementation policy which had been officially adopted by the City.  Accordingly, these are sufficient grounds for prohibiting the City from reversing its position and revoking the land use permit.[9]

## IV.   COUNT I ALLEGES A VALID CLAIM OF PROCEDURAL DUE PROCESS REGARDLESS OF VESTED RIGHTS.

Count I of the complaint alleges: "The due process clause of the 14th Amendment protects against the deprivation of a property interest without notice and an opportunity to be heard at a meaningful time and in a meaningful manner." See allegation 109.

The initial impetus for the stop work order was Shawn Winter, the City's Planning Director, commuting to work on his bicycle past the 326 Land site.  After reporting that to the City Attorney, Mr. Winter responded affirmatively to the following question: "So, in a space of four hours and ten minutes, you put together and issued the stop work order…"  (Winter Deposition, p. 29, **Exhibit E**).  There was no prior notice given to 326 Land, and therefore no opportunity for it to present its case why the *Save Our Downtown* decision should not apply to it, or to explain the progress of construction at that time.

---

[9] In *Save Our Downtown v. City of Traverse City*, the Court of Appeals ruled that although rooftop appurtenances were to be excluded from measurement, the City had been improperly interpreting its own zoning ordinance when measuring to the flat surface of the roof.  This issue was raised by the City with respect to 326 Land only after that decision was issued in October 2022, after this case had been filed and the proposed settlement agreement submitted to the Court. If it is determined that the City is estopped from revoking the Land Use Permit, then this issue is resolved.  However, it should be noted that it has not been established that the measurement to the flat roof of the 326 Land building actually does exceed 60 feet.  There has been no discovery or further investigation of this issue.  The TCZO provides that the measurement of a height of a building having frontage on more than one street is the average elevation of the sidewalks, curbs or center lines closest to the building walls adjoining the street.  The Ordinance further defines a street as any public way at least 16 feet wide.  TCZO Section 1320.07 "Definitions".  Both State Street and the public way behind the building exceed 16 feet in width, according to the City maps. There is about a four foot difference from the front to the back of the site.

*Nasierowski Brothers Investment Co. v. Sterling Heights*, 949 F.2d 890 (6th Cir. 1991) held that a property owner had raised a valid claim of violation of procedural due process rights based on that the City's sudden reversal of position on the zoning of its property. The property owner in that case had undertaken no physical improvements to the property, but had purchased the property based on the City's representation that it could be used as proposed. It had commenced preparation of architectural and site plans, and applied for site plan approval. Under the circumstances present in that case, the Sixth Circuit held that the property owners' procedural due process rights had been violated because of the lack of prior notice and opportunity for hearing. The Court held: "[W]hen a relatively small number of persons are affected on individual grounds the right to a hearing is triggered." *Id.* at 896. The Court went on to rule that the property owner "should have been granted the motion for summary judgment as so far as to requested an injunction prohibiting enforcement of the new zoning ordinance as against his property." The *Nasierowski* decision was followed in *Warren v. City of Athens* 411 F.3d 697 (6th Cir. 2005), finding violation of a restaurant owner's procedural due process rights by blocking access to that building without prior notice or opportunity for hearing.

The *Nasierowski* decision involved fairly egregious facts including a personally interested council member introducing a last-minute zoning ordinance change which prohibited the plaintiff's acknowledged desired use. While we do not suggest such bad motives were present here, the decision was made hastily, without prior notice to 326 Land, or without an opportunity for it to be heard why the Land Use Permit should not be revoked. There is no dispute of fact the City failed to provide 326 Land the required notice and hearing before revoking the land use permit. As indicated by the *Nasierowski* decision, an appropriate remedy would be to enjoin the revocation of the Land Use Permit, and allow the project to proceed approved by the City.

## V.   COUNTS II, V, AND VI DO NOT DEPEND ON THE ESTABLISHMENT OF VESTED RIGHTS

Defendant relies solely on the alleged absence of vested rights in its motion for summary judgment.  However, Count II is a facial challenge to Section 28 of the City Charter on the basis that it violates the due process rights of 326 Land as a property owner desiring to construct a building over 60 feet in height without being subjected to a vote of the electors.  Count V is likewise a facial challenge to Section 28 on the basis that it is invalid as contrary to state law. Count VI is a damage claim, based on the invalidity of Section 28.  326 Land has standing to assert these claims regardless of the establishment of vested rights through construction.

To obtain standing to bring constitutional claims, a plaintiff must demonstrate (1) it suffered an actual or imminent injury in fact, (2) that a causal link exists between "injury and the conduct complained of", and (3) that the injury will be redressed by a favorable decision by the court. *Midwest Media Prop., LLC v. Symmes Twp.*, 503 F.3d 456, 461 (6th Cir. 2007).  Plaintiffs must also demonstrate they have been injured by the challenged action of the defendant. *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 261; 97 S. Ct. 555 (1977).

An "injury in fact" is established if the Plaintiff has alleged a "personal stake in the outcome of the controversy" to justify the exercise of the court's remedial powers on the plaintiff's behalf. *Warth v. Seldin*, 422 U.S. 490, 498; 95 S. Ct. 2197 (1975). Economic interest in developing property is sufficient as injury-in-fact to lay the basis for standing. *Rice v. Vill. of Johnstown*, 30 F.4th 584, 591 (6th Cir. 2022).  To obtain standing, the plaintiff is only required to have an interest that is "within the zone of interests to be protected" by the statute or constitutional guarantee in question. *Association of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 153; 90 S. Ct. 827 (1970).  The Supreme Court recognizes that the right to be "free of arbitrary or irrational

zoning actions," by itself, is sufficient for constitutional standing." *Village of Arlington Heights, supra at 263.*

As a property owner seeking to build a building which is permitted by the TCZO but would be prohibited without an approving vote of the electors under Section 28 of the Charter, 326 Land has standing to assert claims that Section 28 violates due process and State law independently of establishing vested rights through construction.

## VI.    CONCLUSION AND RELIEF REQUESTED.

After Traverse City's voters said "no" to its proposed 100-foot building, 326 Land specifically designed a building, in close contact with the City, that is allowed by right.  After receiving a Land Use Permit from the City confirming that the five-story Peninsula Place building would be permitted without a vote, it tore down a valuable and usable office building.  It proceeded to construct a foundation specifically designed to support the weight of a five-story building.  It sold 21 units in that building, to people counting on living in it, and took $3.7 million in non-refundable deposits.

Then while active construction was ongoing, the City revoked the Land Use Permit without warning, based on a ruling in a lawsuit involving a different building, in which even the Circuit Judge stated did not apply to any other building.  Ironically, the Michigan Court of Appeals has now ruled that the Circuit Judge's decision was wrong.

To state this mildly and within the bounds of due decorum:  326 Land did nothing wrong, yet they are unfairly suffering devasting consequences.  The people who have paid $3.7 million in deposits to live in this building did nothing wrong, yet they are suffering the consequences too. The City should never have revoked the Land Use permit in the first place.  Indeed, if the parties were improperly colluding in some fashion, that never would have happened.

To sum up the City's response now:  "Tough luck."

Determining that 326 Land has obtained vested rights to complete its building is supported by the application of existing Michigan law to the facts.  It is a fair and just outcome.  326 respectfully requests this Court deny the City's Motion for Summary Judgment in its entirety, and grant summary judgment in its favor allowing it to complete its building as permitted by Land Use Permit PLU21-0112.

Respectfully submitted,

MIKA MEYERS PLC
Attorneys for Plaintiff


Dated:  June 20, 2023                    By:    /s/ Ross A. Leisman
                                                   Ross A. Leisman (P41923)
                                                   James F. Scales (P40639)
                                                   900 Monroe Avenue, NW
                                                   Grand Rapids, MI 49503
                                                   (616) 632-8000

## INDEX OF EXHIBITS

Exhibit A       Weston Deposition Excerpts (See Exhibit F of Defendants' Partial Motion for Summary Judgment as to Counts I, II, IV, V, and VI of Plaintiff's Complaint, and for Plaintiff's Claims of Estoppel, Pursuant to FRCP 56. for full deposition)

Exhibit B       County Demolition Application

Exhibit C       City Permit for Demolition

Exhibit D       Follow-Up Email Produced by City

Exhibit E       Winter Deposition Excerpts (See Exhibit E of Defendants' Partial Motion for Summary Judgment as to Counts I, II, IV, V, and VI of Plaintiff's Complaint, and for Plaintiff's Claims of Estoppel, Pursuant to FRCP 56 for full deposition)

Exhibit F       City Permit for Construction

Exhibit G       County Demolition Permit

Exhibit H       Molon Touch Records

Exhibit I       County Building Permit Application

Exhibit J       County Building Permit

Exhibit K       Letter Revoking Land Use Permit

Exhibit L       November 18 Photos

Exhibit M       McIntyre Deposition Excerpts (See Exhibit R of Defendants' Partial Motion for Summary Judgment as to Counts I, II, IV, V, and VI of Plaintiff's Complaint, and for Plaintiff's Claims of Estoppel, Pursuant to FRCP 56 for full deposition)

Exhibit N       Laureto Deposition Excerpts (See Exhibit P of Defendants' Partial Motion for Summary Judgment as to Counts I, II, IV, V, and VI of Plaintiff's Complaint, and for Plaintiff's Claims of Estoppel, Pursuant to FRCP 56 for full deposition)

Exhibit O       Pile Cap Plans and Specifications

Exhibit P       REI Payment Requests

Exhibit Q        Hardman Email Confirming Length and Gauge of Rebar

Exhibit R       2020 Assessment Record

Exhibit S       Other City Permits

03304002 1

Exhibit T        Peninsula Place Construction Deposits

Exhibit U        Peninsula Place Deposits

Exhibit V        *Township of Rose v. Devoted Friends Animal Society*

Exhibit W        Implementation Policy

03304002 1