UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

326 LAND COMPANY, LLC,                          )
                              Plaintiff,         )
                                                 )        No. 1:22-cv-45
-v-                                              )
                                                 )        Honorable Paul L. Maloney
CITY OF TRAVERSE CITY and                        )
SHAWN WINTER,                                    )
                              Defendants.         )
_____  )

## OPINION AND ORDER RESOLVING MOTIONS FOR SUMMARY JUDGMENT

This lawsuit arises, in part, from a stop-work order issued by Defendant Shawn Winter, the Traverse City Planning Director.  Plaintiff 326 Land Company sued Winter and the City of Traverse City.  The court has dismissed all but one cause of action, a claim for a violation of the Equal Protection Clause.  326 Land Company alleges Defendants treated 326 Land Company's building project different from other similar building projects.  The parties filed cross motions for summary judgment on the remaining claim (ECF No. 129 – Defendants; ECF No. 130 – Plaintiff).  Defendant Winter also filed a motion for summary judgment raising various immunity defenses (ECF No. 126).  The facts do not support Plaintiff's remaining claim.  The court will grant Defendants' motions and deny Plaintiff's motion.

I.

A trial court should grant a motion for summary judgment only in the absence of a genuine dispute of any material fact and when the moving party establishes it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The moving party bears the burden of

showing that no genuine issues of material fact exist. *Celotex Corp.. v. Catrett*, 477 U.S. 317, 324 (1986). To meet this burden, the moving party must identify those portions of the pleadings, depositions, answers to interrogatories, admissions, any affidavits, and other evidence in the record, which demonstrate the lack of genuine issue of material fact. Fed. R. Civ. P. 56(c)(1); *Pittman v. Experian Info. Sols., Inc.*, 901 F.3d 619, 627-28 (6th Cir. 2018). The moving party may also meet its burden by showing the absence of evidence to support an essential element of the nonmoving party's claim. *Holis v. Chestnut Bend Homeowners Ass'n*, 760 F.3d 531, 543 (6th Cir. 2014).

When faced with a motion for summary judgment, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." *Pittman*, 901 F.3d at 628 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)). The court must view the facts and draw all reasonable inferences from those facts in the light most favorable to the nonmoving party. *Maben v. Thelen*, 887 F.3d 252, 263 (6th Cir. 2018) (citing *Matsushita Elec. Indust. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). In resolving a motion for summary judgment, the court does not weigh the evidence and determine the truth of the matter; the court determines only if there exists a genuine issue for trial. *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (quoting *Anderson*, 477 U.S. at 249). The question is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-252.

## II.

The events giving rise to this lawsuit date back to 2016.  Plaintiff owned property in Traverse City and intended to build a 100-foot tall building on that property.  During the general election in 2016, the voters approved Proposition 3, which created an amendment to the City Charter.  As a result, Chapter 4, Section 28 of the City Charter required that a majority of voters must approve any proposed building over 60 feet tall before the City could approve the building project.  In 2017, the City adopted an implementation policy for Section 28  (ECF No. 50-3).  The City indicated it would use the guidelines in the existing zoning ordinances when calculating the height of a building (*id.* PageID.705).

Plaintiff challenged Section 28 in the state courts in two different lawsuits.  First, Plaintiff challenged the amendment in the state court without first seeking a vote to approve its plan for a 100-foot building.  The court dismissed the lawsuit for lack of ripeness.  Plaintiff next sought approval of the project from the voters for a 100-foot building.  The voters declined to approve the project.  Plaintiff filed a second lawsuit in the state court challenging the amendment to the City Charter. Resolving cross motions for summary disposition, Judge Power upheld the amendment (ECF No. 50-8 6-25-19 Trans.; ECF No. 50-9 Order).  Plaintiff did not pursue any appeal.

Plaintiff then filed for and, on July 20, 2021, obtained a land use permit from Traverse City to construct the foundation for a five-story residential building (ECF No. 50-10).  In August 2021, Plaintiff also applied to Grand Traverse County for a building permit and stated that the building would be 60 feet above grade (ECF No. 50-11).  Grand Traverse County issued the permit on November 12, 2021 (*id.*).

That same summer, a local organization called Save Our Downtown (SOD) filed a lawsuit in the state courts challenging a different building project in Traverse City, the Innovo building.  In that lawsuit, the parties disputed whether rooftop appurtenances (non-structural accessories on the top of a roof) had to be included when measuring the height of a building for the purpose of Section 28.  On November 10, 2021, at the conclusion of a hearing on motions for summary disposition, Judge Power found that the Innovo building exceeded 60 feet.  First, he found that layers of insulation and other things on top of the roof deck needed to be included when calculating the height of the building and, as a result, the building exceeded 60 feet (ECF No. 50-13 11-10-21 Trans.).  He also concluded that rooftop appurtenances had to be included in the calculation of the building height.  As a result, the Innovo building exceeded 60 feet in height for a second reason (*id.*).  Judge Power issued his written order on November 18, 2021.  The City filed an appeal.

Following Judge Power's order in the Innovo lawsuit, Traverse City issued a stop-work order to Plaintiff regarding the City issued land use permit.  Shawn Winter, the City's Planning Director, issued the order.  Winter testified that he acted on the advice of the City Attorney (ECF No. 129-3 Winter Dep. 2022 at 29 PageID.3870).

Plaintiff promptly applied for another land use permit for a five-story residential building.  The City approved the application on November 29, 2021 (ECF No. 129-10 PageID.4213).  The permit included written stipulations.

> No portion of the building shall exceed 60 feet as stated in Section 28 of the Charter of the City of Traverse City.
> The 'plain meaning' of Section 28 [of the Charter of the City of Traverse City] applies and thus the measurement of the height of the proposed building includes the entire building from the grade to the highest point on top of the

> building structure, including rooftop equipment, elevator towers and components, atriums, parapet and screening walls, stairwells, fixtures, HVAC, mechanical or other mechanical or other equipment, structures or installations, or any other fixture of appurtenance that may be attached to the structure.  No part of a building is excluded in measuring its highest point.

(*id.*).  Tom McIntyre, a member of 326 Land Company, testified that construction for part of the foundation, about 300 pilings occurred in late 2021 and early 2022 (ECF No. 1290-14 McIntyre Dep. at 79 PageID.4362).

In October 2022, the Michigan Court of Appeals affirmed Judge Power's decision in part and reversed in part.  *Save Our Downtown v. City of Traverse City*, 997 N.W. 2d 498 (Mich. Ct. App. 2022).  The court held that the voter-approved initiative did not displace the method for measuring the height of a building set forth in the City's zoning ordinance.  *Id.* at 508.  The court affirmed Judge Power's conclusion that the Innovo building exceeded 60 feet when including the rooftop covering.  *Id.* at 542.  The court further found that the City's method for measuring building height, as set forth in the zoning ordinance, excluded rooftop equipment.  *Id.* at 505.  The court, therefore, reversed the portion of Judge Power's decision that rooftop appurtenances had to be included when measuring the height of a building.  Save Our Downtown unsuccessfully sought leave to appeal from the Michigan Supreme Court.

In 2024, Plaintiff submitted revised plans and submitted an application for a new land use permit to Traverse City (ECF No. 129-7 Weston Aff. ¶ 11 PageID.4135).  McIntyre explained how Plaintiff modified the building proposal to meet the 60-foot height limitation.  The new plans took about one-and-a-half inches from each floor and another twelve inches from the insulation on the roof (ECF No. 129-14 McIntyre 2025 Dep. at 51-52

PageID.4355). Without considering appurtenances, the proposed building did not extend above 60 feet (Weston Aff. ¶ 11b PageID.4135).  The City issued Plaintiff the land use permit on June 24, 2024 (ECF No. 129-12 PageID.4217).

With this context, the court turns to Plaintiff's Equal Protection claim and the cross motions.

### III.

The Fourteenth Amendment to our Constitution prohibits a state from denying to any person within its jurisdiction the equal protection of the law.  U.S. Const. amend. XIV. Sec. 1.  The Sixth Circuit has interpreted the Equal Protect Clause as barring the government from intentionally treating a person differently from others similarly situated without a rational basis for the difference.  *Rockwood Auto Parts, Inc. v. Monroe Cnty.*, 157 F.4th 557, 572 (6th Cir. 2025); *Green Genies, Inc. v. City of Detroit*, 63 F.4th 521, 572 (6th Cir. 2023).  This sort of equal protection claim is often referred to as a class of one.  *See Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam).  A class-of-one plaintiff must show "that it was 'intentionally singled out by government for discriminatory adverse treatment.'"  *Rockwood Auto Parts*, 155 F.4th at 572 (quoting *TriHealth, Inc. v. Bd. of Comm'rs, Hamilton Cnty.*, 430 F.3d 783, 788 (6th Cir. 2005)).

Plaintiffs advancing a class-on-one claim bear a heavy burden.  *Loesel v. City of Frankenmuth*, 692 F.3d 452, 462 (6th Cir. 2012).  First, Plaintiff must demonstrate that it was "treated differently than other property owners who were similarly situated in *all material respects*."  *Id.*  A court must require relevant similarity and must not demand an exact

comparison.  *Id.* The relevant comparison will depend "substantially on the facts and context of the case." *Id.* at 463 (citation omitted).

Second, Plaintiff must establish that the City's actions were "'so unrelated to the achievement of any combination of legitimate purposes that the court can only conclude that the government's actions were irrational.'" *Loesel*, 692 F.3d at 462 (quoting *Rondigo, LLC v. Twp. of Richmond*, 641 F.3d 673, 682 (6th Cir. 2011)).  Plaintiff can establish this element by "'either negating every conceivable reason for the government's actions or by demonstrating that the actions were motivated by animus or ill-will.'" *Id.* (quoting *Rondigo*). The court must presume the government defendant's choice is presumptively valid and the government has no obligation to produce evidence to support the rationality of its choice. *TriHealth*, 430 F.3d at 790.  Nor can the government's action "be deemed to lack rational justification simply because it 'is not made with mathematical nicety or because in practice it results in some inequity.'"  *Id.* (quoting *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 316 n.7 (1993)).

The Sixth Circuit has cautioned courts to view class-of-one claims with skepticism "because such claims have the potential to turn into an exercise in which juries are second-guessing the legislative process." *Loesel*, 692 F.3d at 461.  Quoting the Tenth Circuit, the Sixth Circuit explained that

> All have recognized that, unless carefully circumscribed, the concept of a class-of-one equal protection claim could effectively provide a cause of action for review of almost every executive and administrative decision made by state actors.  It is always possible for persons aggrieved by government action to allege, and almost always produce evidence, that they were treated differently from others, with regard to everything from zoning to licenses to speeding to tax evaluation.  It would become the task of federal courts and juries, then, to

inquire into the grounds for differential treatment and to decide whether those grounds were sufficiently reasonable to satisfy equal protection review.  This would constitute the federal courts as general-purpose second-guessers of the reasonableness of broad areas of state and local decisionmaking:  a role that is both ill-suited to the federal courts and offensive to state and local autonomy in our federal system.

*Id.* at 452 (quoting *Jennings v. City of Stillwater*, 383 F.3d 1199, 1210-11 (10th Cir. 2004)).

Applying rational review to an equal protection claim, a court must exercise judicial restraint because our "'Constitution presumes that, absent some reason to infer antipathy, even improvident decisions will eventually be rectified by the democratic process and that judicial intervention is generally unwarranted no matter how unwisely we may think a political branch as acted.'"  *TriHealth*, 430 F.3d at 791 (quoting *Beach Commc'ns*, 508 U.S. at 314).

## IV.

Plaintiff identifies multiple acts that allegedly violated its right to the equal protection of the law.  The court considers each act.

## A.

Plaintiff complains that the City used different methods for measuring the heights of similarly situated buildings.  Plaintiff argues that the City measured the height of its building using the grade from one street only while it measured the height of at least one similarly situated building, the Innovo building, using the grade from two streets.  The different measurement methods allegedly resulted in adverse treatment.  The evidence does not support Plaintiff's argument.

Traverse City determines the height of a building using the City's zoning ordinances. After the voters approved the new initiative, the City adopted an Implementation Policy to

use the City's zoning ordinances to measure the height of a building.  The Michigan Court of Appeal concluded that the zoning ordinances provided the method for determining the height of a building.  The City's zoning ordinances define the "height of building" as "the vertical distance from the grade to the highest point on a mansard or flat roof or to the median height between the eaves and the ridge for gable, hip and gambrel roofs" (ECF No. 50-1 PageID.681).  The ordinance provides that the word grade has different meanings depending out whether the building abuts one or more than one street.  "Grade" means

> (1) *For buildings having wall adjoining 1 street only*:  the elevation of the public sidewalk, top of curb, or centerline of the street right-of-way, whichever is closer to the building, where a building wall adjoins a street.
> (2) *For buildings having walls adjoining more than 1 street*: the average elevation of the sidewalks, curbs or centerlines of streets, whichever is closest to the building walls adjoining the streets.

(*Id.* PageID.680).  When a building abuts one street and the elevation where the building abuts that street changes, the City uses the average elevation of that sidewalk, curb or street when measuring the height of the building (Weston Aff. ¶ 6.c.i PageID.4131).  And when the building abuts two or more streets, the City uses the average elevation of the two sidewalks, curbs or streets (*id.* ¶ 6.c.ii PageID.4132).

As evidence of dissimilar treatment, Plaintiff points to testimony from Dave Weston, the Traverse City Zoning Administrator, at his December 2025 deposition.  Plaintiff argues that Weston testified that the City measures the height of a building using the "'average grade' around a building" (ECF No. 132 at 3 PageID.4949).  Plaintiff argues that Weston testified that the City looked at the grade around the Innovo building—it looked at multiple sides of the building to determine its average height—even though the Innovo building only abutted

one street.  When the City determined the height of other buildings downtown that abutted more than one street, the City used the average grade of the abutting streets.  But, the City considered the grade of only one street when measuring the height of Plaintiff's building.  Plaintiff argues that if the City had used the average grade from around its building, its building would have measured two feet shorter.

Viewing the evidence in the light most favorable to Defendants, Plaintiff has not established a genuine issue of material fact for this equal protection claim.  First, regardless of how the grade was measured, the City would have issued the stop work order following Judge Power's order because, including the appurtenances, the building exceeded sixty feet.  Plaintiff has not identified any other entity with a land use permit for a foundation for a 60-foot building with rooftop appurtenances that was allowed to proceed with construction in the days and weeks following Judge Power's November 2021 order.

Second, the City did not use different methods for measuring the height of buildings that abutted a single street.  Plaintiff mischaracterizes Weston's testimony.  Weston never testified that the City uses the average grade "around a building."  Weston testified that the City used the average grade.  Plaintiff adds the language, "around a building" (ECF No. 132 Pl. Brief at 3 PageID.4979), which does not appear in Weston's testimony on the pages cited by Plaintiff.  When a building abuts a single street, the City calculates the average grade using measurements from the street or curb or sidewalk on that side of the building only.

Plaintiff contends that the Innovo building is similarly situated because both the Innovo building plans and Plaintiff's building plans show that the two buildings would abut a single street.  The Innovo building plans showed that the building would abut one street,

10

Hall Street (Weston Aff. ¶ 15a PageID.1436). Hall Street does not slope where the Innovo building was supposed to be built (*id.* ¶ 15d PageID.1436-37).

Weston testified that he determined the height of the Innovo building using only the grade on Hall Street. During the relevant portion of his testimony, Weston repeatedly refers to "A40," which is the drawing panel for the portion of the Innovo building that abuts Hall Street, the east elevation (ECF Nos. 129-16 and 129-17). Weston admitted that he "looked" at the south elevation, panel drawing A4.1, where that side of the building connected to Hall Street. He looked at other section elevations to make sure they were consistent.

> A. It was – the building height – on this particular building, we determined on the elevations and the sections per the design professional. As you can see, the doors open out on the sidewalk, ant that's the – that's the elevations that I used to evaluate this. So the top of the building deck was at 160, and the top of – and then there's appurtenance above that I did not calculate the height, so A40 I used. And just A40 for the building height, maybe the south elevation where it hits the street. All consistent with the what the design professional submitted, and – and that's it. I probably looked at some section elevations.
> ...
> . . .
>
> A. So typically, I'll look at some section elevations to make sure those are consistent as well.
>
> Q. And it was your standard practice at this time to use average grade?
>
> A. It's my standard practice to look at when – again, when I – so when you look at A40, I looked at that street, and I looked at the first floor elevation. The doors open out on the sidewalks. I had taken average grade on that Hall Street is relatively flat. When – again, when I look at steeper properties, properties with significant grades, perhaps on corner lots, then I'll look at the average grade.
>
> Q. But at least for this building, you said you looked at the south and the east elevations?

A.  I would say that typically, I looked at the east elevation and the south elevation, which is on the street as well.  And I would look at some section drawings that would go through the building.

Q.  And would you have averaged all of those elevations out to make sure it comes under 60 feet?

A.  No, I wouldn't average them.  They'll all the – all these elevations are consistent.  They're all the same.  On the south elevation, the first floor is 100.  Roof deck is 160.  On the east elevation first floor is 100, and roof deck is 160.

Q.  So the average would be the same throughout, but you looked at multiple elevations on different sides to determine that, correct?

A. Yeah.

(ECF No. 132-1 Weston 2025 Dep. at 45-46 PageID.5038-39).

Defendants submitted an affidavit from Weston that clarifies how he measured the height of the Innovo building prior to Judge Power's ruling (Weston Aff. ¶ 15 PageID.4136-37).  He used only the wall of the building abutting Hall Street (*id.*).  Weston looked at the drawing for the south elevation, A4.1, to confirm the height of the southeast corner of the building, which abutted Hall Street (*id.* ). The affidavit does not constitute a sham affidavit because it does not directly contradict his sworn deposition testimony.  *See France v. Lucas*, 836 F.3d 612, 622 (6th Cir. 2016).  In addition, this testimony establishes that the Innovo building differs from Plaintiff's building in a material way. The Innovo building was constructed on relatively flat ground where the grade did not change.  Plaintiff's building was constructed on an area where the grade did change.  The two buildings were not, therefore, similarly situated.

For its equal protection claim based on different treatment of building plans abutting one street, Plaintiff has not established a lack of a genuine issue of material fact. The court will deny Plaintiff's motion for summary judgment on this claim.

Viewing this same evidence in the light most favorable to Plaintiff, Defendants are entitled to summary judgment on this equal protection claim. Defendants have demonstrated a lack of genuine issue of material fact. Winter would have issued the stop work order because of the height of the rooftop appurtenances. Even if Weston's deposition could be interpreted as creating a genuine issue of material fact whether he calculated the average grade using more than one side of the building, his affidavit clarifies that he did not. And, the different elevations around Plaintiff's building make it different from the Innovo building, which was located on a relatively flat site. The different elevations were a material difference.

## B.

Alternatively, Plaintiff contends its building actually abuts two streets and Defendants failed to use the average grade using both streets to measure the height of Plaintiff's building.

The City's zoning ordinances define both "street" and "alley" and distinguish between the two. "Street" means "any public way, such as a public street, avenue or boulevard, at least sixteen feet wide. 'Street' does not mean 'alley'" (ECF No. 50-1 PageID.687). "Alley" means "a way which functions primarily as a service corridor and provides access to properties abutting thereon. "Alley' does not mean 'street'" (*id.* PageID.676). State Street abutted the north of Plaintiff's building site and had a public sidewalk between the building

and State Street (Weston Aff. ¶ 7a PageID.1433).  On the south side, Plaintiff's building site abutted a platted alley (*id.* ¶ 7f PageID.4134).

Plaintiff argues the area to the south of its building is a street, not an alley.  Plaintiff contends the area is a public way that exceeds sixteen feet (ECF No. 132-1 Weston Dep. 2025 at 34 PageID.5027). Plaintiff argues the passageway connects Washington Street and Boardman Avenue and has more traffic than Washington Street (ECF No. 132-2 McIntyre Dep. at 85 PageID.5255).

Viewing the evidence in the light most favorable to Defendants, the passage to the south of its building is an alley, not a street.  As Plaintiff acknowledges, Weston testified that the passage is platted on the City map as an alley, not a street (ECF 132-1 Weston Dep. 2025 at 33 PageID.5026).  Shawn Winter testified that "the plat map makes it very, very clear what is a street and what is an alley, when the city was originally laid out and divided into lots and rights-of-ways" (ECF No. 131-5 Winter 2025 Dep. at 38 PageID.4886).  He explained

> An alley is an alley, and a street is a street.  So we – there's no grey area to determine.  You have an alley running between two parallel streets that are named, that receive state funding.  They have wider right-of-way width that was platted with the State.  An alley has no addresses.  It has no name.  All the street addresses are off the platted streets.

(*id.*).  Weston has never used a platted alley to determine the grade when making height measurements (ECF No. 132-1 Weston Dep. 2025 at 120 PageID.5113).  He explained that the right-of-way for alleys in Traverse City is 33 feet (*id.* at 34 PageID.5027).  The zoning ordinance does not indicate that any passageway that exceeds sixteen feet must be a street. Plaintiff's evidence indicates only the volume of traffic, not the passageway's nature or function.  Weston testified that the paved area to the south of Plaintiff's building was used to

"provide access to other properties, services, deliveries, things of that nature" (*id.* at 33 PageID.5026).

Because the City properly considers the passageway to the south of Plaintiff's building to be an alley, the grade of the alley cannot be considered when determining the height of Plaintiff's building.  Plaintiff has presented no evidence establishing that the City has considered the grade of an alley when determining the height of any similarly situated building.

For Plaintiff's equal protection claim based on the assertion that its building abuts two streets, the court will grant Defendants' motion for summary judgment and will deny Plaintiff's motion for summary judgment.  Plaintiff has not established a lack of a genuine issue of material fact that its building abuts two streets.  Viewing the same evidence in the light most favorable to Plaintiff, Defendants have established a lack of a genuine issue of material fact that Plaintiff's building abuts only one street.

C.

Plaintiff alleges it obtained vested rights to an eighteen-inch rooftop covering when it poured the foundation for its building in late 2021 and early 2022.  Plaintiff contends the City treated it differently from other similarly situated properties when the City refused to lift the stop-work order after October 13, 2022.  Plaintiff argues that other properties, like Commongrounds, had a rooftop covering that exceeded sixty feet but the City did not issue it any stop-work order and did not otherwise interfere with its construction.

Plaintiff obtained two land use permits from Traverse City.  The City issued the first permit, PLU21-0112, on July 20, 2021 (ECF No. 50-10 PageID.959).  After Judge Power's

15

ruling in the Innovo lawsuit in November 2021, the City issued a stop-work order for the July 2021 permit (ECF No. 50-15).  The stop work order referenced the July 2021 permit by number (*id.*).  The order stated that the permit "is no longer valid and all associated work under that permit must cease and desist immediately until revised building plans consistent with Section 28 and the Judgment Order has been submitted and approved"  (*id.* PageID.1055).

The City issued the second permit, PLU21-0173, on November 29, 2021 (ECF No. 129-10  PageID.4213).  The second permit described the same permitted project (a foundation) and included stipulations limiting the height of the building (*id.*).  The stipulations stated that the building could not exceed sixty feet and clarified that "no part of a building is excluded in measuring to its highest point" (ECF No. 129-10 PageID.4213).  In 2025, McIntyre testified that Plaintiff submitted revised plans to the City in order to start pouring parts of the foundation because the staging was set up and the contractors were lined up (ECF No. 132-2 McIntyre Dep. 2025 at 89 PageID.5259).  At his deposition in 2022, McIntyre explained how the plans were revised.  The revised plans eliminated three rooftop terraces, eliminated the stairwells and the elevator shafts on the roof and removed the mechanical equipment from the roof, most of which were relocated to the fifth floor where two residential units had been taken out (ECF No. 129-13 McIntyre Dep. 2022 at 69 PageID.4287).

Plaintiff points to Weston's 2025 deposition where he testified that pouring the pilings for the foundation would be sufficient to create vested rights (ECF No. 132-1 Weston Dep.

2025 at 25 PageID.5018).[1]  Later in the deposition, plaintiff's counsel asked more questions about the second land use permit that issued after the stop work order.  Weston agreed that the second permit was based on a revised drawing that Plaintiff submitted (*id.* at 80 PageID.5073). Weston testified that he did not see any issue with the eighteen-inch rooftop covering in the revised drawing in November 2021 (*id.* at 81 PageID.5074).  On follow up questions from defense counsel, Weston explained that the height of the building, including the rooftop covering, did not exceed sixty feet in the revised plans for which the City issued the second land use permit (ECF No. 132-1 Weston Dep. 2025 at 83 PageID.5076). Weston testified that Plaintiff did not try to build any building based on the revised plans and the City never issued a stop work order directed at the second land use permit (*id.* at 83-85 PageID.5076-78).

Viewing the evidence in the light most favorable to Defendants, Plaintiff has not established a lack of a genuine issue of material fact for this equal protection claim based on vested rights.  In an earlier opinion, this court found that Plaintiff did not have vested rights to construct any building based on the first land use permit (ECF No. 78).  Assuming for the sake of argument only that Plaintiff obtained vested rights to the revised plans submitted to the City in November 2021 after Judge Power's ruling, Plaintiff would be entitled to construct a building based on those revised plans.  But the City did not prevent Plaintiff from constructing any building based on the revised plans.  To be clear, the stop work order applied to the first land use permit, not the second permit.  The first land use permit was

---

[1]     Weston also testified that "he wasn't versed in the law" (*id.* at 87 PageID.5080).

17

based on plans for a building with a height over sixty feet including the rooftop covering. That building proposal could not be constructed after Judge Power's ruling in November 2021. The rooftop covering was one of the reasons why the City issued the stop work order (the other was the appurtenances). In October 2022, the Michigan Court of Appeals affirmed that portion of Judge Power's ruling. Plaintiff has not established that the City had any basis for lifting the stop work order.

In addition, Plaintiff has not identified any building that was similarly situated. Plaintiff contends that the Commongrounds building was similarly situated and it had a rooftop covering that exceeded sixty feet (ECF No. 132-8 Simpson Aff. PageID.5460). The Commongrounds building was not similarly situated to Plaintiff's building at the time the stop work order issued. At the time the City issued Plaintiff the stop work order, construction on the Commongrounds building was well underway. The Commongrounds building is located at 414 East Eighth Street (ECF No. 132-1 Weston Dep. 2025 at 98 PageID.5091). The land use permit for the Commongrounds building issued in October 2020, more than one year before Judge Power's order (*id.* at 98-99 PageID.5091-92). When Judge Power issued his order in November 2021, the Commongrounds building had already poured the foundation and had some portion of the structure completed (*id.* at 99 PageID.5092). The contractors were doing interior work on stairwells (*id.* at 100 PageID.5093). And, for this particular equal protection claim based on vested rights, Plaintiff needed to identify a building similarly situated to the building for which it obtained the second land use permit, not the first land use permit. Plaintiff did not obtain vested rights to any building based on the first land use permit.

The court makes one additional note for this equal protection vested rights claim. Weston testified that he did not consider rooftop coverings as part of the height of a building prior to the time the stop work order issued (ECF No. 132-1 Weston Dep. 2025 at 19 PageID.5012). He repeatedly testified that "we've consistently measured buildings the same way until Judge Power's ruling" (*id.* at 44 PageID.5037). He testified that he measured all of the projects in town consistently through the years, ..., until Judge Power made his ruling (*id.* at 57 PageID.4049). Weston testified that, after Judge Power's ruling "anything that projected above the allowed height" became an issue (*id.* at 20 PageID.5013). Weston did not testify that that the Michigan Court of Appeals opinion in October 2022 created a "new rule" (counsel's word) after Plaintiff had poured the pilings and foundation (ECF No. 132-1 Weston Dep. at 27 PageID.5019). Weston agreed with counsel's inquiry, but his response indicated Weston and counsel were confusing two similarly sounding words. Weston did not agree that there was a new rule. He responded, "Yeah, it's a new –- is a new roof" (*id.*). And it was; the revised plans on which the second land use permit was based and which allowed Plaintiff to pour the pilings had a lower roof than the earlier plans.

Counsel does get Weston to alter his testimony about rooftop coverings on page 135 of the deposition. Counsel does this by suggesting that rooftop coverings were included when measuring the height of buildings "starting October of 2022" following the opinion issued by the Michigan Court of Appeals (ECF No. 132-1 Weston Dep. at 134-35 PageID.5127-28).[2]

---

[2] On this point, counsel is incorrect. In November 2021, Judge Power ruled that rooftop coverings had to be included when measuring the height of the building. Weston's testimony throughout the rest of his deposition reflects that he was aware of this portion of Judge Power's ruling.

Weston first reacts with surprise, "Oh," then agrees with counsel that the rooftop covering for Exhibit 70 would not have been an issue when Weston approved the second land use permit in November 2021 (*id.* at 135 PageID.5128).

The testimony on page 135 does not help Plaintiff. Exhibit 70 is the revised plans that were used to obtain the second land use permit (*id.* at 83 PageID.5076). Discussing the revised plans earlier in the deposition, Weston testified that "the highest point of the building, *which would have included the roof membrane* because there's a slight little parapet there, and that's at 60 feet" (*id.* emphasis added). Counsel asked a follow up question just for clarification: "So Exhibit 70, top of – top of 326 Land building, including the rooftop membrane, tops out at 60 feet?" (*id.*) Weston replied "yeah" (*id.*). The revised plans were consistent with Judge Power's November 2021 ruling that no part of the roof could exceed sixty feet. If Plaintiff obtained any vested rights after pouring the pilings, it obtained rights based on the plans submitted to the City after Judge Power's issued his ruling. The revised plans did not have a rooftop covering that exceeded sixty feet.

For these reasons, the court declines to grant summary judgment for Plaintiff on its equal protection vested rights claim.

Viewing the evidence in the light most favorable to Plaintiff, Defendants have established a lack of a genuine issue of material fact on the equal protection vested rights issue. The City did not prevent Plaintiff from constructing the building used to secure the second land use permit. The Court of Appeals opinion affirmed a portion of Judge Power's ruling that provided one reason for the City to issue the stop work order. And, Plaintiff has

not identified any similarly situated building, one that is materially similar to the building on which the second land use permit was based.

D.

Finally, Plaintiff contends the City denied a request for a variance that would have resolved the problem with the height of the roof covering. Plaintiff asserts the City granted similar requests for similarly situated properties. Plaintiff argues that Winter declined to grant a variance that would allow Plaintiff to lower the height of the first floor, which would have had resulted in lowering the height of the entire building. According to Plaintiff, the City has authorized practical-difficulty variances for other similarly situated properties.

The Traverse City Zoning Ordinances (TCZO) authorizes the Zoning Board to grant variances from the Zoning Code "if all the basic conditions are satisfied, and if there are practical difficulties or unnecessary hardships in the way of carrying out the strict letter of the Zoning Code." TCZO § 1324.05(d). Section 1346.09(12) authorizes the Planning Director to "grant a first floor building height exception if it has been clearly demonstrated that such provision is unnecessary or that such requirements would create a practical difficulty, as contrasted to merely granting an advantage or convenience."[3] *Id.* § 1346.09(12). The Michigan Court of Appeals has noted that Michigan "as not established criteria for determining when a landowner will suffer a practical difficulty from enforcement of a zoning ordinance." *Nat'l Boatland, Inc. v. Farmington Hills Zoning Bd. of Appeals*, 380 N.W. 2d

---

[3] The ordinance authorizes the Planning Director to grant an exception rather than a variance. Defendants note the difference. The Zoning Board of Appeals uses a single application form to request a variance, an exception, an appeal or an ordinance interpretation or reconsideration, which is available on the Board's website.

472, 476 (Mich. Ct. App. 1985).  Citing *National Boatland*, about twenty years later, the Michigan Court of Appeals indicated that courts should consider whether the denial of a variance would (1) deprive the owner of the use of the property, (2) whether compliance would be unnecessarily burdensome, (3) and whether granting a variance would do substantial justice to the owner.  *Norman Corp. v. City of East Tawas*, 687 N.W.2d 861, 867 (Mich. Ct. App. 2004).

Viewing the evidence in the light most favorable to Defendants, Plaintiff has not established a lack of a genuine issue of material fact for its equal protection height variance claim.  For an equal protection challenge to a zoning question, the Sixth Circuit requires a plaintiff to first apply for a variance and obtain a final decision in order for the claim to be ripe.  *Thornton v. City of Allegan*, 863 F. Supp. 504, 507-08 (W.D. Mich. 1993) (citing *Pearson v. City of Grand Blanc*, 961 F.2d 1211, 1214 (6th Cir. 1992)); *see Asmar v. City of Walled Lake*, No. 2:16cv14101, 2017 WL 4585706, at *4 (E.D. Mich. Oct. 16, 2017) ("As with Taking Clause claims, equal protection zoning claims are not ripe without a showing of finality ...."). The record contains no evidence that Plaintiff ever applied for a variance or an exception from the first-floor height requirement.  McIntyre testified he had a conversation with Winter about lowering the ceiling in the parking garage (the first floor) by one foot (ECF No. 132-2 McIntyre Dep. at 28 PageID.5196).  According to McIntyre, Winter indicated that the code would not permit lowering the ceiling (*id.* at 27 PageID.5197; at 80 PageID.5250; at 92 PageID.5262).  Winter confirmed that he had discussions about a waiver from the zoning requirements for first-floor height (ECF No. 132-5 Winter Dep. at 32

PageID.5369).  But having a conversation with the Planning Director is not a substitute for filing an application.

Plaintiff argues that because this equal protection claim relies on § 1983, it does not have to exhaust administrative remedies before seeking judicial relief.  But, "[e]xhaustion and finality are two distinct concerns, although they sometimes overlap."  *Grace Cnty. Church v. Lenox Twp.*, 544 F.3d 609, 614 (6th Cir. 2008).  Plaintiff's exhaustion argument overlooks the ripeness problem that land use claims present for federal courts.  *See Vill. Green v. Town of Islip*, 43 F.4th 287, 293 (2d Cir. 2022).  "In the context of land disputes, we resort to a ripeness doctrine known as the 'final-decision requirement.'"  *Mills Pond Group, LLC v. Town of Smithtown*, No. 24-307-cv, 2025 WL 1720472, at *1 (2d Cir. 2025) (citing *Vill. Green*, 43 F.4th at 294).  "In practice, this means that ripeness is conditioned on the property owner submitting at least one meaningful application for a variance."  *Id.* (citation modified; quoting *BMG Monroe I, LLC v. Vill. of Monroe*, 93 F.4th 595, 600 (2d Cir. 2024)).  Following this protocol, "[a] landowner must apply for a variance before coming to federal court even where, as here, her plans for her property were stymied by an intervening change in local law."  *Id.* The Sixth Circuit has applied the finality requirement to equal protection claims arising in land use claims.[4]  *Miles v. Christi Religious Order v. Twp. of Northville*, 629 F.3d 533, 537 (6th Cir. 2010) (citing *Bannum, Inc. v. City of Louisville*, 958 F.2d 1354, 1362 (6th Cir. 1992)); *Insomnia Inc. v. City of Memphis*, 278 F.

---

[4]     "Ripeness is not just a procedural question, but one that is determinative of jurisdiction."  *Crosby v. Pickaway Cnty. Gen. Health Dist.*, 303 F. App'x 251, 259 (6th Cir. 2008).  Although ripeness is a prudential concern, it implicates the Article III limitations on a federal court's authority and, therefore, can be raised at any time, including on the court's initiative.  *Kentucky Press Ass'n, Inc. v. Kentucky*, 454 F.3d 505, 509 (6th Cir. 2006).

App'x 609, 613-14 (6th Cir. 2008). Plaintiff has not argued or attempted to show that submitting an application for a variance or an exception would have been futile.

Plaintiff's equal protection height variance claim suffers from other problems. Under Michigan law relevant to zoning, practical difficulties cannot be self-created. *Norman Corp.*, 687 N.W.2d at 867. Plaintiff could have, and eventually did, redesign the building to comply with the zoning ordinance's height requirement. Plaintiff's reluctance to find ways to lower the height of the building was largely driven by economic concerns, not by an inability to comply with the zoning ordinance.

Plaintiff also has not identified any similarly situated property that the City treated differently. In its brief, Plaintiff suggests that similarly situated properties facing practical difficulties exist and cites Winter's deposition at pages 29 and 30 (ECF No. 132 at 14 PageID.4990). Winter testified that he has granted a few exceptions based on unique parking situations that required people to park on the side of their house to avoid a code violation for parking on a sidewalk (ECF No. 131-5 Winter Dep. at 29-30 PageID.4844-78). Plaintiff makes no attempt to explain how the unique parking situations are similar to its building height issue. Winter also testified that he has never granted an exception for the height requirement for first floor (*id.* at 27-28 PageID.4875-76).

For these reasons, the court declines to grant summary judgment for Plaintiff on its equal protection height variance claim.

Viewing the evidence in the light most favorable to Plaintiff, Defendants have demonstrated a lack of a genuine issue of material fact for the equal protection height variance claim. The record contains no evidence that City has ever granted a variance to any

property for the first-floor height requirement.  And the record contains no evidence that the City has granted variances for practical difficulties for any property similar to the situation faced by Plaintiff.

## V.

Finally, the court turns to Winter's motion for summary judgment where he raises defenses unique to the claims against him.

### A.  Official Capacity

Winter seeks dismissal of any claim brought against him in his official capacity. Plaintiff named both Winter and the City of Traverse City as defendants.  The complaint does not specifically indicate whether Plaintiff sued Winter in his individual capacity, his official capacity, or both.[5]  Plaintiff insists it did sue Winter in his official capacity (ECF No. 136 at 5 PageID.5975).

Courts treat claims brought against a government official in his or her official capacity as claims against the government entity.  *Hafer v. Melo*, 502 U.S. 21, 25 (1991); *Briner v. City of Ontario*, 370 F. App'x 682, 699 (6th Cir. 2010).  When a plaintiff sues the government entity and one of its officials in his or her official capacity, the claim against the individual is "superfluous."  *Faith Baptist Church v. Waterford Twp.*, 522 F. App'x 322, 327 (6th Cir. 2013).  An official capacity lawsuit against a government official "is *not* a suit against the official personally, for the real party in interest is the entity."  *Kentucky v. Graham*, 473 U.S.

---

[5]     In the absence of a specific allegation, the Sixth Circuit instructs that courts should employ a "course of the proceedings" test. *Moore v. City of Harriman*, 272 F.3d 769, 773 (6th Cir. 2001) (en banc).

25

159, 166 (1985).  Thus, when a plaintiff pleads the same claim against a government entity and one of its officials in his or her official capacity, the court can dismiss the official capacity claim.  *E.g., J.H. v. Williamson Cnty.*, 951 F.3d 709, n.4 (6th Cir. 2020) ("The district court correctly dismissed these official capacity claims as superfluous of the claim against the county.") (citing *Foster v. Michigan*, 573 F. App'x 377, 390 (6th Cir. 2014)).  District courts in the Sixth Circuit routinely dismiss official capacity claims against a government official when the plaintiff also sues the entity itself.  *See Whiting v. City of Athens*, 699 F. Supp. 3d 652, 659 (E.D. Tenn. 2023); *Rodgers v. Oakland Cnty.*, No. 18cv12832, 2019 WL 3777031, at *4 (E.D. Mich. Aug. 12, 2019) (collecting cases); *Agema v. City of Allegan*, No. 1:12cv417, 2015 WL 1022084, at *4 (W.D. Mich. Mar. 9, 2015) (collecting cases); *Scott v. Tipton Cnty.*, No. 10-2616, 2011 WL 2515976, at *3 (W.D. Tenn. June 22, 2011) (collecting cases).

The court will dismiss any claim brought against Winter in his official capacity.

## B.

Winter also seeks both quasi-judicial immunity and qualified immunity.  Having concluded that the record does not support any of Plaintiff's claims, the court need not consider whether Winter enjoys immunity.  Where the officer does not violate a plaintiff's constitutional rights, the immunity defenses become moot.[6]  *See Adams v. City of Auburn Hills*, 336 F.3d 515, 520 (6th Cir. 2003) ("Because the Fourth Amendment is not implicated, Adams has not alleged a constitutional violation to support a § 1983 claim.  Without an

---

[6]    Similarly, when a court first addresses the clearly established prong in a qualified immunity analysis and finds in favor of the defendant, the court need to consider whether a constitutional violation occurred become moot.  *See Burnett v. Griffith*, 33 F.4th 907, 915 (6th Cir. 2022) (citing *Wheeler v. City of Lansing*, 660 F.3d 931, 940 (6th Cir. 2011)).

underlying constitutional violation, the question of whether Backstrom is entitled to qualified immunity is moot."); *Ahlers v. Schebil,* 188 F.3d 365, 374 (6th Cir. 1999) ("As we hold that sufficient probable cause existed, this necessarily means that the arrest complied with constitutional requirements and that Ahlers was not deprived of a constitutional right. As a result, there is no claim under § 1983, and Defendants have no need for a qualified immunity defense.").

## VI.

Defendants are entitled to summary judgment on Plaintiff's equal protection claim. Plaintiff has not established a genuine issue of material fact that Defendants treated Plaintiff differently than other similarly situated entities. Quite simply, there were no similarly situated buildings in Traverse City at the time Winter issued the stop work order. Nor has Plaintiff been able to identify any similarly situated building that Defendants treated differently for the other theories Plaintiff has advanced. In addition, Plaintiff has not established that the allegedly adverse decisions were utterly irrational. Plaintiff has not put forth any evidence of animus or ill will. And Plaintiff has not negated every possible reason for Defendants' decisions. At best, Plaintiff complains about adverse ordinance decisions and asks the court to second guess the zoning decisions made by local decision makers.

## ORDER

Consistent with the accompanying Opinion, the court **GRANTS** Defendants motion for summary judgment on Plaintiff's equal protection claim (ECF No. 129) and **DENIES** Plaintiff's motion for summary judgment (ECF No. 130).  The court also **GRANTS IN PART and DISMISSES AS MOOT IN PART** Defendant Winter's motion for summary judgment (ECF No. 126).  **IT IS SO ORDERED.**

Date:    April 28, 2026                                 /s/  Paul L. Maloney
                                                                        Paul L. Maloney
                                                                        United States District Judge